Belknap
No. 86-451

## The State of New Hampshire

v.

## Howard W. Denney

December 31, 1987
(Decided December 23, 1987)

*Stephen E. Merrill,* attorney general (*Tina Schneider,* assistant attorney general, on the brief, and *Steven L. Winer,* assistant attorney general, orally), for the State.

*Joanne Green,* assistant appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J. The defendant appeals his conviction of driving while intoxicated, second offense, after a jury trial in the Superior Court (*O'Neil,* J.), and raises the following question for our review: whether part I, article 15 of the New Hampshire Constitution, guaranteeing due process, precludes the State from introducing into evidence a defendant's refusal to submit to a blood alcohol test (a test), where he had not been warned that his refusal could be used against him at trial. *See* RSA 265:88-a (Supp. 1986). We hold that the admission of the defendant's refusal as evidence in this case deprived him of due process, and we reverse the defendant's conviction and remand for a new trial.

The relevant facts are as follows. Shortly after midnight on December 21, 1985, Officer Jeffrey Bonan of the Gilford Police Department was patrolling the area of Route 11A and Savage Road in Gilford. While traveling westbound on Route 11A, Officer Bonan saw in his rearview mirror a car heading eastbound, straddling the passing lane, and he turned around to follow it. The car made a left-hand turn, without a directional signal, and proceeded up the road about 150 feet. Officer Bonan pulled over behind the vehicle and turned on his blue lights. He approached the vehicle and asked the defendant operator for his license and registration.

After detecting a moderate odor of alcohol on the defendant, whose face was flushed, Officer Bonan asked him to step from the car. After the defendant failed various field sobriety tests, Officer Bonan placed him under arrest for driving while intoxicated.

En route to the police station, *Miranda* warnings were administered, and, as is required by statute (RSA 265:87), the defendant was advised of his rights under RSA 265:87 and the "consequences

of his refusal to permit a test at the direction of the law enforcement officer." Officer Bonan did not, however, inform the defendant that if he refused to submit to a blood alcohol test the fact that he so refused could be used as evidence against him at trial. The defendant declined to take a blood alcohol test.

At trial, the defendant testified that the odor of alcohol was due to his consumption of four non-alcoholic "near beers," and that his inability to perform the field sobriety tests was the result of a "trick knee," a ruptured disc in his back, and arthritis in his back and his right knee. He testified that he elected not to submit to a blood alcohol test because of his concern that the non-alcoholic beer would produce a false positive result.

The jury found the defendant guilty. The court sentenced him to six months in the house of correction, with all but ten days suspended, imposed a $500 fine, and revoked his driver's license for three years. The defendant then brought this appeal.

We begin our analysis with a discussion of RSA 265:87 as it relates to this case. That statute provides:

> "I. Before any [chemical test] is given, the law enforcement officer shall:
>
> (a) Inform the arrested person of his right to have a similar test or tests made by a person of his own choosing;
>
> (b) Afford him an opportunity to request such additional test; and
>
> (c) Inform him of *the consequences of his refusal to permit a test* at the direction of the law enforcement officer.

(Emphasis added.) RSA 265:88-a (Supp. 1986) provides:

> "If a person refuses to submit to a [chemical test], such refusal may be admissible into evidence in a civil or criminal action or proceeding arising out of an act alleged to have been committed by that person while driving or attempting to drive a motor vehicle while under the influence of intoxicating liquor or any controlled drug."

As a sanction against the State, when the officer fails to comply with RSA 265:87, I(c), RSA 265:87, II prohibits the State from introducing the results of the test into evidence at the driver's trial. No statute provides the driver with a remedy when the driver does not take the test, and his refusal is induced by the officer's failure

to tell him that his refusal could be introduced as evidence. Therefore, any relief available to the defendant must come from the constitution.

 Part I, article 15 of the New Hampshire Constitution provides, in pertinent part: "No subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by . . . the law of the land." It is well settled that "law of the land" in this article means due process of law. *Petition of Harvey*, 108 N.H. 196, 198, 230 A.2d 757, 758 (1967).

In *State v. Cormier*, 127 N.H. 253, 260, 499 A.2d 986, 991 (1985), this court held that the evidentiary use of a DWI defendant's refusal to provide a sample of breath or bodily substance for chemical testing does not violate the guarantee against compelled self-incrimination provided by part I, article 15 of the State Constitution. Thus, there remains only the question, presented here, whether the evidentiary use of such a refusal violates due process under the same constitutional provision. We need not discuss any federal due process issue, *see South Dakota v. Neville*, 459 U.S. 553 (1983), since this issue is not raised on appeal and is deemed waived.

 The case before us concerns the admission into evidence at a criminal or civil trial of the driver's refusal to take the test. Without doubt, the admission of the refusal into evidence, pursuant to statute, is a direct consequence of refusing. Thus, in order to affirm the defendant's conviction, we would have to interpret due process as allowing admitting into evidence the driver's refusal to take the test when the officer has not complied with RSA 265:87, I(c). We interpret the statute to deny admission of the results of the test where the officer has failed to warn the defendant of the direct consequences of his failure to take the test. We have stated previously that, "[T]he ultimate standard for judging a due process claim . . . is the notion of fundamental fairness." *State v. Martin*, 125 N.H. 672, 676, 484 A.2d 1176, 1179 (1984); *see Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1072, 454 A.2d 435, 441 (1982).

 The implied consent law provides to an individual arrested for a violation or misdemeanor a statutory right to refuse to render a sample for a blood alcohol test. *State v. Cormier*, 127 N.H. 253, 257-58, 499 A.2d 986, 989 (1985). Such a refusal, however, cannot be accomplished with impunity. "[T]he legislature has attached two strings to a refusal." *Id.* at 258, 499 A.2d at 989. *Cormier* goes on to explain that the strings are, first, that RSA 265:92 (Supp. 1986)

provides that refusal to submit to a blood alcohol test results in a possible maximum one-year administrative revocation of the arrestee's driver's license, and, second, that RSA 265:88-a (Supp. 1986) provides for the admission of a refusal as evidence in court.

RSA 265:87, I(c), however, requires the arresting officer to "[i]nform [the arrested person] of the *consequences* of his refusal to permit a test" before a test is given. (Emphasis added.) In the instant case, the defendant was apprised of only one of the two "strings" or direct consequences attached to a refusal. We read RSA 265:87, I(c) to require informing the arrestee, before the test is given, that a refusal to permit a test, pursuant to RSA 265:84, may be introduced as evidence in court. RSA 265:88-a (Supp. 1986). An arrestee who refuses to take the test is not likely to be cognizant that in doing so he is producing "evidence" for the State to use against him at trial, whereas in submitting to a test the arrestee likely understands that he is providing such evidence to the State.

We note that the process due the defendant in this case is to be distinguished from the process due a defendant when collateral consequences, not direct consequences, are in issue. Such was the case in *State v. Ramsden*, 117 N.H. 772, 378 A.2d 1370 (1977), where we rejected an arrestee's claim that the police are obligated to inform a person how to get a license reinstated after it has been revoked for failing to take a breathalyzer test. *Id.* at 773, 378 A.2d at 1370. Likewise, in *State v. Levey*, 122 N.H. 375, 445 A.2d 1089 (1982), we rejected the defendant's argument that she must be informed that a DWI conviction could be used to impose a mandatory jail sentence for a subsequent offense. *Id.* at 377, 445 A.2d at 1090. More recently, in *State v. Jenkins*, 128 N.H. 672, 517 A.2d 1182 (1986), we held that due process does not require that defendants be informed they may face enhanced charges based upon blood alcohol test results. *Id.* at 675, 517 A.2d at 1184. We followed this same approach earlier this year in the case of *Hess v. Turner*, 129 N.H. 491, 529 A.2d 386 (1987). In *Hess* we held that the timing of a revocation is a consequence that need not be the subject of a warning. *Id.* at 494, 529 A.2d at 388. Neither due process nor any statutory provision requires that an arrested person be advised of all possible consequences. *Id.* Rather, if the legislature wanted an arrested person to be so advised, it would so legislate. *State v. Ramsden supra.*

Collateral consequences arise during the sentencing stage of the criminal process, where due process requirements are less stringent. *State v. Breest*, 116 N.H. 734, 755, 367 A.2d 1320, 1336

(1976). "The judge can 'exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within the limits fixed by law.'" *Id.* (quoting *Williams v. New York*, 337 U.S. 241, 246 (1949)). The question before us involves the use of the defendant's refusal to take the test not for the purpose of determining the appropriate punishment, but rather, for the purpose of determining the defendant's guilt. "Tribunals passing on the guilt of the defendant have been hedged in by strict evidentiary procedural limitations." *Williams v. New York*, 337 U.S. at 246.

We believe that the legislature has spoken on the facts now before us. RSA 265:88-a provides that the refusal to submit to a test may be admissible into evidence, and RSA 265:87 obligates a law enforcement officer to inform an arrestee of the consequences of refusal. The failure, by the officer here, to notify the arrestee violates the process due under part I, article 15 of our State Constitution.

As the South Dakota Supreme Court noted in *State v. Neville*, 346 N.W.2d 425, 430 (S.D. 1984), *overruled on other grounds, State v. Hoenscheid*, 374 N.W.2d 128, 129–30 (S.D. 1985), upon remand from the United States Supreme Court in *South Dakota v. Neville*, 459 U.S. 553, "the requirement that an arresting officer must *fully inform* a defendant driver of the consequences of a refusal to submit to a blood alcohol test" is inherent in due process protection. (Emphasis added.) Here, the defendant was informed only that his refusal would subject him to license revocation, and not that his refusal would be admissible in a trial arising out of his arrest. "The very consequence of which the arresting officer failed to warn [the defendant] is that consequence which the State now seeks to impose." *State v. Neville, supra* at 431. It is unrealistic to say that a suspect warned of one specific direct consequence flowing from his refusal could reasonably infer that he is also subject to other, unspecified direct consequences. Rather, the warning reasonably conveys the message that refusal results only in the imposition of the named consequence and no other direct consequence.

■ Under RSA 265:87, the legislature set forth specific procedures for the law enforcement officer to follow before administering the blood alcohol test under RSA 265:84. These procedures are not rights given to defendants prosecuted for driving under the influence, but rather, they serve as protection for every citizen or person stopped on the highway by law enforcement officers. Similarly, the State Constitution guarantees every citizen due process of the law. *State v. Damiano*, 124 N.H. 742, 746, 474

A.2d 1045, 1047 (1984). If the evidence of refusal is admissible simply because the officer's conduct does not "shock the conscience," then the legislative requirements would be worthless. *See, e.g., State v. Cooper,* 127 N.H. 119, 498 A.2d 1209 (1985); *Griffin v. Illinois,* 351 U.S. 12 (1955). We do not believe the legislature intended the statute to be applied in such an arbitrary manner.

The State conceded at oral argument that it has an interest in having arrestees submit to chemical tests, as the results of such tests are often the best evidence available to the State in a DWI prosecution. Providing a warning that a refusal to take such a test is admissible in court can only serve this interest.

In summary, we hold that the due process guarantee contained in part I, article 15 of the New Hampshire Constitution requires that those arrested for DWI be informed that the fact of their refusal to submit to a blood alcohol test can be admitted against them at the trial arising out of their arrest.

*Reversed.*

SOUTER and THAYER, JJ., dissented; the others concurred.

SOUTER, J., dissenting: I respectfully dissent from the opinion of the court's majority. In their application of the due process guarantee of part I, article 15 of the State Constitution, and its prohibition against fundamental procedural unfairness, they hold that evidence of a defendant's refusal to submit to a blood alcohol test under the implied consent law (RSA 265:84 *et seq.*) is inadmissible, unless the police have first warned the defendant of that potential evidentiary consequence. Assuming *arguendo* that the majority are correct in their view of what due process requires, I would conclude that the police gave the defendant in this DWI case an adequate warning. On the basic due process issue itself, however, I would hold that no such warning is required.

There is no need to restate the facts, except to repeat that the arresting officer gave *Miranda* warnings before requesting the defendant to take the test. *See Miranda v. Arizona,* 384 U.S. 436 (1966). One of those warnings advised the defendant that if he made any statement, it could and would be used as evidence against him. *See id.* at 469. Because that warning was certainly adequate to advise him that a statement of his refusal to take the test would be so used, the police in this case provided the defendant with the very advice that the majority require as a condition for admitting evidence of the refusal. Even, therefore, on the majority's own view

of what due process requires, they have no justification for reversing this conviction.

(Lest there be anything misleading about my own reliance on *Miranda,* however, I should add that I do not rule out the possibility of conflict between a *Miranda* warning of the right to silence and the introduction of evidence that subsequent to the warning the defendant chose to remain silent as a means of refusing to submit to a blood test under the implied consent law. *See Doyle v. Ohio,* 426 U.S. 610 (1976). This problem is not, of course, before us, and it has no bearing on either the majority's or the dissenters' views of how to resolve the issue that is before us. Suffice it to say here that the potential conflict may be addressed in light of *South Dakota v. Neville,* 459 U.S. 553 (1983), which held that a defendant's implied consent law obligation to choose between taking and refusing a blood test is not "compelled" within the meaning of the fifth amendment, *id.* at 563–64; *see State v. Cormier,* 127 N.H. 253, 258–59, 499 A.2d 986, 990 (1985), which it is the object of *Miranda* to serve. *Doyle v. Ohio, supra* at 617; *Miranda v. Arizona, supra* at 467.)

My disagreement with the majority does not stop, however, at the adequacy of *Miranda* warnings to satisfy their due process warning requirement, for their more fundamental error lies in holding that due process requires such a warning at all. That error appears to have its source in one or more of three separate positions that the majority adopt: about the statutory obligations imposed on the police by the implied consent law, about constitutional standards of evidentiary admissibility and fundamental fairness, and about the inferences that can reasonably be drawn from actual police behavior in cases like this one. I believe that each position is itself mistaken.

The statutory mistake lies in the majority's interpretation of RSA 265:87, I(c), which provides that before a blood alcohol test is given the police officer must inform an arrested DWI defendant of, *inter alia,* the "consequences" of a refusal to permit the test. The majority assume without explanation that the potential evidentiary use of a refusal, *see* RSA 265:88-a (Supp. 1986), is one such consequence to which the statute refers, and they go on to suggest that due process would be denied if a trial court were to admit evidence of a refusal when the police "officer [had] not complied with RSA 265:87."

Much might be said about the supposed need of a State court to resort to the State due process clause to exclude evidence of the refusal, if the government really had failed to comply with a statutory requirement for validly requesting the test. Here,

however, it is more important to explain why I believe the majority misinterpret the statute when they assume that the "consequences" of refusal that are subject to the statutory warning requirement include use of the refusal as evidence of guilt.

Of course, even the majority recognize that the statute can not be read so broadly as to require warnings about all possible effects of refusal, of whatever sort. Despite the soundness of this recognition, it nevertheless takes the majority in the wrong direction, for it leads them to employ what Justice Thayer's dissent demonstrates to be their untenable and inconsistently applied distinction between "direct" consequences that must be warned about, and "collateral" consequences that can be ignored. Compare the majority opinion *supra* with *State v. Jenkins*, 128 N.H. 672, 517 A.2d 1182 (1986).

Instead, however, of trying to make sense of "consequences" by applying this unworkable dichotomy between the "direct" and the "collateral," we can follow a far simpler course for determining what "consequences" the legislature had in mind, by looking to the statute as a whole. *See King v. Town of Lyme*, 126 N.H. 279, 284, 490 A.2d 1369, 1372 (1985) (meaning of a statute is to be determined from its construction as a whole). One immediately sees that the requirement to give advice about the "consequences" of refusing, RSA 265:87, was enacted at the same time as the original version of RSA 265:92 (Supp. 1986), which expressly describes two such consequences: a refusal will (1) preclude the test and (2) lead to a revocation of driver's license or privilege to operate a motor vehicle. *Id.*, subsection I. Thus, "consequences" in § 87 may most reasonably be interpreted as referring to the prohibition of the test and the revocation of the license, as each is described in § 92. It would be consistent with the legislature's intent, therefore, to conclude that these are the "consequences" that must be warned about, and to hold that the evidentiary use of a refusal need not be the subject of warning or advice to a defendant.

This conclusion is strengthened by contrasting two other statutory provisions of the implied consent law. RSA 265:92, II(f) (Supp. 1986) provides that the State may effect the administrative license revocation only if the police officer who requested the test also warned the defendant that his refusal would carry that consequence; but RSA 265:88-a (Supp. 1986) imposes no warning requirement when it provides that a defendant's refusal may be used as evidence against him at trial. The contrast confirms that the legislature neither intended evidentiary admissibility to be treated as one of the "consequences" of refusal that a defendant

need be warned about, nor assumed that it ever would be so understood. The majority's contrary interpretation is thus unsound, and inadequate to justify today's result even on a theory that State due process is an appropriate basis for relief from the consequences of the government's failure to comply with a State statute.

The second mistaken view that animates the majority is, like the first, left more to suggestion than to explanation in any detail. The majority contrast the respective situations of defendants who submit to a test and those who refuse, by saying that the former probably appreciate that they will thereby provide evidence, whereas the latter probably do not understand that a refusal could be used as evidence of guilt. The majority thus assume that there is constitutional significance simply in a defendant's likely understanding of the evidentiary potential of what he does or says. Their assumption is one that calls for some examination.

Although the majority cite no supporting authority for their position, it has an undeniably familiar ring, which, I suggest, is the echo of *Miranda*. It is an expansive and distorted echo, however, for the majority effectively transform the familiar and specific requirement of *Miranda v. Arizona*, 384 U.S. 436 (1966), into a general rule of evidence, unlimited by any reference to the constitutional privilege that *Miranda* was intended to serve.

It is sufficient here to recall that *Miranda* requirements to warn a defendant that his statement may be used against him, and to advise him of his rights to silence and the assistance of counsel, are predicated on the fifth amendment privilege against compelled self-incrimination, *Miranda v. Arizona, supra* at 444; *see also Doyle v. Ohio*, 426 U.S. 610, 617 (1976). *Miranda* proceeds on the theory that a defendant who is ignorant of the fifth amendment privilege may not validly waive it, and the Supreme Court's stated object in imposing the warning requirement is to lessen the risk that a defendant will unwittingly compromise his opportunity to claim the benefit of the constitutional privilege. *Id.* at 467.

Enforcement of the implied consent law does not, in and of itself, raise any such risk, however. *South Dakota v. Neville supra* held that a DWI defendant's obligation to choose between permitting or refusing a blood alcohol test is not a compelled response within the meaning of the fifth amendment, and our own case of *State v. Cormier supra* reached the same result with respect to the privilege as it is guaranteed in part I, article 15 of the State Constitution. Therefore, a police request, without more, to choose between permitting or refusing a test under the implied consent law requires no warning of potential evidentiary use under *Miranda,*

and would require no such warning under the State Constitution if *Miranda* were a State constitutional case.

Once we understand that *Miranda* has no precedential relevance here, we can appreciate how significant it is that the majority do not even claim to have constitutional authority for their general assumption that evidence obtained from a defendant may not be used against him unless he understood, or at least was warned, that such use would occur. This want of authority should, indeed, come as no surprise, for we all know that courts daily admit evidence volunteered to police informants who customarily misrepresent their loyalties in order to get damaging information from defendants, who have no idea they are dealing with agents of the government, and no inkling they are providing evidence that the government will use to convict them. *See State v. Lewis*, 129 N.H. 787, 798, 533 A.2d 358, 365 (1987); *State v. Kilgus*, 128 N.H. 577, 592-93, 519 A.2d 231, 241 (1986); *Hoffa v. United States*, 385 U.S. 293 (1966), *reh'g denied*, 386 U.S. 940, 951 (1967).

With this realization that the majority can proffer no recognized and generalized constitutional basis extending beyond *Miranda* for requiring warnings of the evidentiary potential of a defendant's speech, we are in a position to recognize that the invocation of due process opens up no obvious route to the relief the defendant seeks. And we are, likewise, forced to come to grips with the basic questions of just what it is that fundamental unfairness entails as a criterion for finding violations of procedural due process, and what it is that is supposed to be thus fundamentally unfair when an unwarned defendant's uncoerced statement is used to convict him.

To understand why I believe the majority have misapprehended what a demonstration of fundamental unfairness should require, it is worth starting with a look at the small number of New Hampshire cases that have dealt expressly with the concept. In *State v. Martin*, 125 N.H. 672, 676, 484 A.2d 1176, 1179 (1984), this court held there was no denial of fundamental fairness in trying a defendant for DWI, merely because the State was unable to produce evidence of blood alcohol testing. And in *State v. Lewis*, 129 N.H. at 797, 533 A.2d at 364, we held there was no fundamental unfairness in honoring a defendant's waiver of counsel, despite his invocation of the right to counsel during a police interview conducted two months previously.

On the other hand, we did find fundamental unfairness in *Appeal of Public Service Co. of N.H.*, 122 N.H. 1062, 1073, 454 A.2d 435, 441 (1982), when an administrative tribunal not only adjudicated

an issue that fell outside the stated purposes of a pending proceeding, but did so on the basis of *ex parte* communications to a member of the tribunal. And in *Appeal of Plantier*, 126 N.H. 500, 509, 494 A.2d 270, 275 (1985) we held it fundamentally unfair to entertain a proceeding for revocation of a professional license when the complainant's nine-year delay in filing charges had prejudiced the respondent's capacity to defend himself.

Although this body of cases is a small one, it permits at least the tentative generalizations that an adjudicatory procedure is fundamentally unfair when the procedure itself provides one party with a significant advantage, and places his opponent in a corresponding position of prejudice in the search for truth or the assessment of culpability; or when the procedure allows one party to reap the benefit of his own behavior in placing his opponent at an unmerited and misleading disadvantage. *Public Service* gave examples of the former when the court condemned the surprise advantage of *ex parte* evidence in litigating a matter never timely placed in issue; *Plantier* exemplified the latter, in barring a complainant from proceeding after he had lulled his opponent into forgoing the preservation of evidence that might have been employed in defense. The essence of such fundamental unfairness lies not in the mere weakness of one party's position, but in the use of a procedure that produces the party's disadvantage, or that allows an opponent to benefit from his own improper conduct in producing the disadvantage. While I do not mean to suggest that these examples and generalizations represent the limits of our concern to avoid fundamental procedural unfairness, I think they are enough to place the burden on the majority of this court to explain exactly what is fundamentally unfair in the procedure employed in this case, as distinguished from what the defendant finds unfortunate in the probative force of the evidence. And while, again, these examples and generalizations may not be exhaustive, they do stand as good reasons to approach the claim of fundamental unfairness now before us in the same way that the Supreme Court of the United States has done in similar cases, by asking whether the trial court admitted inculpatory evidence that a defendant was induced to provide as a result of police deception, *see Doyle v. Ohio*, 426 U.S. at 621 (Stevens, J., dissenting), or police trickery, *South Dakota v. Neville*, 459 U.S. at 565–66.

The search for police deception or trickery, or other improper conduct in this case, however, does no more than reveal the poverty of the defendant's State due process claim. The defendant addresses the character of the police behavior with a single assertion, that

in warning him that his license would be revoked if he refused a test, the police officer implicitly represented that a refusal would have no other consequences. This assertion, it should be recognized, states a conclusion, not a fact. It simply assumes that the police officer advised the defendant about the potential administrative revocation of his license in such a way as to suggest that he was thereby describing all possible consequences of a refusal to take the test. If this were true, of course, the defendant would have a colorable due process claim. If, for instance, the officer had made some general statement that he was about to advise the defendant comprehensively about all the legal effects of refusal, a failure to address the law of evidence might indeed suggest that a refusal would be given no evidentiary weight. Or if the officer had explicitly warned that the results of any test would be used as evidence, the failure to say more might have suggested that there was no other evidentiary consequence to consider.

The officer did not, however, indicate that he was providing a survey of all consequences, and he said nothing even touching on the law of evidence. On these facts it is simply far-fetched to argue that a defendant would reasonably have inferred that his refusal could have no possible significance beyond the administrative proceeding for revocation of his license, and it is instructive, certainly, that this defendant does not even pretend that he engaged in such a reasoning process. Prior to the first, oral implied consent warnings the defendant stated "Yes, I'm drunk, I'm cocked, I've had too much to drink. I shouldn't be driving," following which he was "boisterous and belligerent" as he rode in handcuffs to the police station. It would strain reality to suggest that the defendant may have reasoned from the premise known as "expressio unius est exclusio alterius," and it is only slightly less of a strain to conclude generally that warning of the administrative consequence of refusing a test implicitly warrants that the refusal can have no other significance.

The implausibility of the defendant's assertion serves to remind us again that is it not "fundamentally unfair" simply that a defendant without any constitutional privilege to refuse may have predicated his refusal on a mistake of law, or may have exercised poor judgement in refusing to take the test. For a defendant's mistake does not necessarily imply police trickery, any more than his imprudence implies police deception. What is important is that there is not even a hint of blameworthy police conduct in this case, and in the absence of improper police activity in obtaining the

evidence, there was no fundamental unfairness when the court admitted that evidence at trial.

The judgment of conviction should be affirmed.

THAYER, J., dissenting: My disagreement with the majority opinion is based upon both procedural and substantive grounds.

I need not recite the facts of this case, because they are mostly uncontested and the majority has adequately set them forth. I will, however, note initially my procedural objection. The majority deals with the State constitutional question in issue without alluding in any way to a decision of the United States Supreme Court on the exact issue under the Federal Constitution. *See South Dakota v. Neville*, 459 U.S. 553 (1983).

Our citizens are entitled, and indeed have the right, to seek redress under our State Constitution. However, when interpreting the State Constitution, this court's analysis should, at the very least, distinguish United States Supreme Court decisions concerning the same issue, especially if an inconsistent holding results. The citizens of this State are entitled to know when their *State* Constitution is being interpreted in such a way as to give individuals accused of crimes greater rights than these same individuals are given under the Federal Constitution, because our citizens have the constitutional right to correct the imbalance, if they wish, by constitutional revision. *See* N.H. CONST. pt. II, art. 100. The procedural approach with which I find fault here may also be used when both federal and State constitutional claims are made. *See State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983).

I will now discuss my substantive objection to the majority's view. A South Dakota statutory scheme identical to the one at issue here has been analyzed by the United States Supreme Court utilizing the due process clause of the Federal Constitution. *See South Dakota v. Neville*, 459 U.S. 553. In *Neville*, the defendant, like the defendant herein, had been arrested for driving under the influence and had been requested to take a blood alcohol test. Neville, like the defendant in the case at bar, had been informed of the consequence of his refusal to take the test, as provided by statute, *i.e.*, loss of license, but had not been informed of the statutory provision allowing his refusal to be admitted into evidence at trial. Both Neville and Denney were advised of their *Miranda* rights prior to being informed of the consequences of their refusal to take a blood alcohol test, the significance of which has been discussed by Justice Souter in his dissent.

Neville argued that his due process rights under the Federal Constitution were violated because he had a statutory right to be informed of the consequence of his refusal to take the blood alcohol test and that he had not been informed that his refusal could be admitted as evidence at trial. Neville drew an analogy to the giving of *Miranda* warnings and the inadmissibility into evidence of the defendant's availing himself of his right to remain silent based on fundamental fairness grounds. *Doyle v. Ohio,* 426 U.S. 610 (1976).

The United States Supreme Court disagreed with Neville's contention and held that the due process requirements of the Federal Constitution had not been violated. The Court held that the right protected by *Miranda* warnings, *Miranda v. Arizona,* 384 U.S. 436 (1966), was of constitutional dimension and thus could not be unduly burdened, whereas the right to refuse the blood alcohol test, in contrast, was "simply a matter of grace bestowed by the South Dakota Legislature," *Neville,* 459 U.S. at 565, since compelled blood tests under normal circumstances do not deprive a defendant of his protection against self-incrimination. *Schmerber v. California,* 384 U.S. 757 (1966). Furthermore, the Court reasoned that "the *Miranda* warnings emphasize the dangers of choosing to speak ('whatever you say can and will be used as evidence against you in court'), but give no warnings of adverse consequences from choosing to remain silent." *Neville,* 459 U.S. at 565. This failure to warn of the consequences of silence, the Court recognized in *Doyle,* implicitly assured the suspect that his silence would not be used against him. In discussing the implied consent law of South Dakota, which parallels New Hampshire's, the Court found "it unrealistic to say that the warnings given [by the police] implicitly assure a suspect that no consequences other that those mentioned will occur. Importantly, the warning that he could lose his driver's license made it clear that refusing the test was not a 'safe harbor,' free of adverse consequences." *Id.* at 566. Although the State in *Neville* did not warn the defendant that the test results could be used against him, the Supreme Court held that "such a failure to warn was not the sort of implicit promise to forgo use of evidence that would unfairly 'trick' respondent [as in *Miranda* warnings] if the evidence were later offered against him at trial." *Id.* The Court then concluded "that the use of evidence of refusal after these warnings comported with the fundamental fairness required by due process." *Id.*

The South Dakota Supreme Court, however, eventually held that under that State's constitution the failure to inform the defendant of the possible evidentiary use of his refusal did violate the State

due process clause. The South Dakota Supreme Court so found on the basis that "the very consequence of which the arresting officer failed to warn Neville is that consequence which the State now seeks to impose." *State v. Neville*, 346 N.W.2d 425, 431 (S.D. 1984).

The majority of this court have today decided to follow the South Dakota court, but in so doing they have not contrasted their holding with that of the United States Supreme Court. They have especially failed to contrast the Federal Constitution's requirement that there be a finding of governmental trickery in order to substantiate the claim that fundamental fairness dictates the granting of relief under the federal due process clause. The defendant here does not allege any trickery on the part of the State. Trickery is an important element in determining whether the defendant's protestations of being denied fundamental fairness are valid. The majority find only that the State failed to inform the defendant of a statutory ramification of his refusal to take a test. Yet, it is with this minimal finding that they hold the procedure here is fundamentally unfair. Nor have the majority properly recognized the existing precedent of this court in arriving at the conclusion that our State Constitution provides greater due process protections to DWI suspects than the Federal Constitution.

The majority's analysis begins with a consideration of the statutory requirement that a defendant must be informed of the consequences of his refusal to take a blood alcohol test. RSA 265:87, I(c). My colleagues then point to the statutory provisions allowing for the admissibility into evidence of the defendant's refusal to take the test, RSA 265:88-a (Supp. 1986), and conclude this evidentiary possibility is a consequence under RSA 265:87, I(c). They fail to mention, however, that no State statute requires that the defendant be warned that his refusal can be used against him, nor do they cite any legislative history that could lead to the conclusion that the legislature intended that the warning be given in order to satisfy RSA 265:87, I(c). *See State v. Ramsden*, 117 N.H. 772, 773, 378 A.2d 1370, 1370 (1977). The majority do, however, rely for their conclusion on the South Dakota Supreme Court's statement in *Neville* that "the very consequence of which the arresting officer failed to warn [the defendant] is that consequence which the State now seeks to impose." *State v. Neville*, 346 N.W.2d at 431.

In an attempt to buttress their argument, the majority opines that we should differentiate between direct consequences of refusal and collateral consequences of refusal, within the context of the implied consent law and the due process clause of our State Constitution. The distinction they offer is that direct consequences

are those matters that are relevant to the determination of *guilt*, while collateral consequences are those matters that are relevant to the determination of the appropriate punishment.

The majority conclude that an individual must be told of the direct consequences of his refusal to take a blood alcohol test and that, therefore, the State must inform an individual of the possible evidentiary use at trial of his refusal to take the test.

The majority cite as authority for their reasoning and analysis the case of *State v. Jenkins*, 128 N.H. 672, 517 A.2d 1182 (1986). However, the holding of that case is contrary to their theory. Jenkins had been arrested for DWI and was told, pursuant to RSA 265:87, I(c), the consequence of his refusal to take the blood alcohol test; to wit, loss of license. He was not told that if he took the blood alcohol test and it indicated a blood alcohol level in excess of .20 he could be charged with aggravated DWI, a misdemeanor, rather than with DWI, a violation, and thereby be subjected to the possibility of incarceration, and an increased fine. The defendant took the blood alcohol test and, based on the results which were to be entered into evidence at trial, was charged with aggravated DWI. As a practical matter the test results would be the best, if not the only, evidence of his blood alcohol level's being .20 or above. The test results were used to prove guilt, and that use was a direct consequence of choosing to take the test.

The *Jenkins* court, including the majority herein, held that the due process clause of the State Constitution did not require that the defendant be informed of the possible evidentiary use at trial of the test results. The court went on to say that:

> "It is clear to us, however, that when the police stop drivers they suspect are intoxicated, they have no duty beyond that prescribed by RSA 265:87 to educate those drivers who are unaware of the law. Every citizen is generally presumed to know the law, else there would be no law. *State v. Carver*, 69 N.H. 216, 219, 39 A. 973, 975 (1897). Thus, the failure of the police to inform the defendants of the potentially greater punishment does not violate the defendants' rights under the due process clause of the New Hampshire Constitution."

*Jenkins, supra* at 675, 517 A.2d at 1184.

The majority's argument in the present case was equally applicable in *Jenkins*; namely, that "the very consequence of which the arresting officer failed to warn [the defendant] is that consequence which the State now seeks to impose." (Quoting *State v. Neville*, 346 N.W.2d 425.) The *Jenkins* court found that the State

had informed the defendant of the consequences of his refusal, as required by the statute, RSA 265:87, and had not violated the due process requirement of the State Constitution by not warning of the possible use of the results in determining his guilt.

This court correctly analyzed the due process provision of the State Constitution in *Jenkins*, and it has sadly, without so stating, overruled *Jenkins* and not provided us with any reason for doing so. Therefore, from the majority opinion, I must respectfully dissent.