Merrimack
No. 2008-443

THE STATE OF NEW HAMPSHIRE

v.

BRANDON BILODEAU

Argued: October 7, 2009
Opinion Issued: March 10, 2010

760

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*William J. Schultz*, public defender, of Manchester, on the brief and orally, for the defendant.

HICKS, J. The defendant, Brandon Bilodeau, appeals his conviction of assault by a prisoner. *See* RSA 642:9 (2007). He argues that the Superior Court (*Mangones*, J.) erred in denying his motion to suppress his statements to the police. We affirm.

The following facts are supported by the record. On January 4, 2007, the defendant, an inmate in the Secure Psychiatric Unit at the State Prison, was accused of stabbing a fellow prisoner. The next day, two state police detectives investigated the stabbing and sought to interview the defendant. He refused to speak to the detectives and asked for an attorney. On

January 9 and January 12, 2007, the defendant sent "inmate request slips" inquiring about the status of the investigation and whether the State planned to pursue charges against him. The second slip read, "What is the current status of the incident . . . ? No one has answered any requests in regards to this matter and I don't know if I should seek outside legal counsel. Please let me know what is going on." One officer responded to the note — a response that the defendant characterizes in his brief as "[m]inimal."

On March 19, 2007, prison officials called the detectives to advise them that the defendant wished to speak with them. They returned to the prison to interview the defendant. The detectives read the defendant his *Miranda* rights from a standard form. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). The defendant stated he understood them and wanted to waive them. He then signed a form waiving his rights. Subsequently, he confessed that he had stabbed a fellow prisoner in the back with a sharpened toothbrush. Near the end of the fifteen-minute interview, one of the detectives wrote a summary of the defendant's statement on the waiver form, and read it to the defendant. The defendant then signed the statement.

At no point before or during this interview did the detectives inquire as to the defendant's mental health either from the defendant or the medical staff at the prison. The detectives testified that the defendant appeared "lucid" and that he spoke "pretty articulate[ly]." Specifically, one detective testified that the defendant "knew what he wanted to say, how he wanted to say it. You know, he seemed fine to me . . . . I didn't have any reason to believe he wasn't there of his own accord." The other detective testified that he had known the defendant for fourteen years and had no concerns about the defendant's demeanor.

The defendant moved to suppress the oral and written statements, arguing that he did not knowingly, intelligently and voluntarily waive his *Miranda* rights, and that his statements were involuntary under the Due Process Clause of the New Hampshire Constitution. He presented evidence that upon admittance to the Secure Psychiatric Unit, he suffered from depression, suicidal ideation, hallucinations, mood disorders, and an anti-social personality disorder. To treat these conditions, the defendant was receiving five medications daily at the time of his confession. The trial court denied the defendant's motion.

On appeal, the defendant contends that his statements were involuntary and, therefore, their admission at trial violated his due process rights under the New Hampshire Constitution. *See* N.H. CONST. pt. I, art. 15. Part I, Article 15 of the New Hampshire Constitution provides that "[n]o

subject shall be . . . compelled to accuse or furnish evidence against himself" and guarantees every citizen due process of law. *Id.* For a statement to be admissible at trial, the State must prove beyond a reasonable doubt that the statement was voluntary. *State v. Rezk,* 150 N.H. 483, 486 (2004). Whether a statement is voluntary is a question of fact for the trial court to determine. *State v. Hammond,* 144 N.H. 401, 404 (1999). We will not reverse the trial court's determination unless the manifest weight of the evidence viewed in the light most favorable to the State is to the contrary. *Rezk,* 150 N.H. at 486.

No single definition of voluntariness exists that can be mechanically applied. *State v. Damiano,* 124 N.H. 742, 747 (1984). The focus of the inquiry is "whether the actions of an individual are the product of an essentially free and unconstrained choice." *Hammond,* 144 N.H. at 405 (quotation omitted); *Damiano,* 124 N.H. at 747. The decision to confess "must be freely self-determined." *In re Wesley B.,* 145 N.H. 428, 430 (2000) (quotation omitted). A confession cannot be "the product of a will overborne by police tactics, or of a mind incapable of conscious choice." *Hammond,* 144 N.H. at 405 (quotation omitted).

The Due Process Clause of the State Constitution requires that we make a determination of voluntariness in light of "the totality of all surrounding circumstances." *Rezk,* 150 N.H. at 487 (quotation omitted). We analyze "both the characteristics of the accused and the details of the interrogation." *Id.* (quotation omitted). Here, the defendant argues that his psychiatric condition combined with subtle police coercion made his statements involuntary. He also contends that the State did not "verify a rational thought process" or establish that the defendant had "any ability to exercise meaningful discretion with the police."

Under the Due Process Clause, we consider a person's mental or developmental condition if it impairs his capacity for self-determination or his ability to resist police coercion. *In re Wesley B.,* 145 N.H. at 430-32. The defendant may not be able to "make a meaningful choice" to confess or may have a heightened vulnerability to what otherwise would be acceptable police tactics. *Id.* at 431 (quotation omitted); *see State v. Chapman,* 135 N.H. 390, 400-01 (1992) ("[P]roof of a deranged or deficient mental state may be highly significant in determining whether any given police conduct was overbearing in its effect." (quotation omitted)). Mental illness, however, "does not, as a matter of law, render a confession involuntary." *Hammond,* 144 N.H. at 405 (quotation omitted). The trial court still must determine "whether, given the totality of the circumstances, the defendant's state-

ments were the product of a rational intellect and a free will." *In re Wesley B.*, 145 N.H. at 431 (quotation omitted).

The trial court, after listening to the testimony of the officers, reviewing medical files provided by the defendant, and reading the defendant's communications with prison authorities, found that the State had proved beyond a reasonable doubt that the defendant's statements were voluntary based upon the totality of the circumstances. In its analysis, the trial court acknowledged that the defendant was housed in the psychiatric treatment unit at the time of the alleged crime and that he received medication for his psychiatric condition. Nevertheless, the trial court found that the defendant "was well able to sufficiently process information and make choices" and had the ability "to consider his legal rights and his options, including whether to waive his rights."

■ Based upon our review of the record, we cannot say that the trial court's finding was contrary to the manifest weight of the evidence when viewed in the light most favorable to the State. *See Hammond*, 144 N.H. at 405. There was evidence that the defendant's mental condition did not critically impair his capacity for self-determination and that his will was not overborne. *See id.* On January 5, 2007, one day after the alleged stabbing, the defendant invoked his *Miranda* rights when the officers sought to interview him. One of the detectives testified that the defendant chose not to speak with him, stating that "he wanted to talk to an attorney but at some point in the future he may want to speak to us." The defendant also sent two "inmate request slips" on January 9 and January 12 inquiring about the ongoing investigation, even asking if he "should seek outside legal counsel." While admittedly occurring two months before the March 17, 2007 interview at issue, these actions indicate that the defendant understood his basic legal rights and could make a meaningful choice whether to invoke them.

The events surrounding the defendant's interview on March 19, 2007, also evidence that the defendant's decision to confess was "freely self-determined." *Wesley B.*, 145 N.H. at 430 (quotation omitted). The interview only occurred after the defendant sent a message through prison personnel that he wished to speak with the detectives. The detectives responded to this request, went to the Secure Housing Unit where the defendant was held, and interviewed the defendant in the attorney conference room. At the start of the interview, the detectives read the defendant his *Miranda* warnings line by line from a standard form which he signed. The defendant wrote "yes" on the form next to the questions, "Do you understand each of these rights?" and "Understanding these rights are you willing to answer questions?"

While compliance with *Miranda* does not conclusively establish the voluntariness of a later confession, it is one factor that a trial court can consider. *See State v. Rodney Portigue*, 125 N.H. 352, 364 (1984). Police officers do not have to engage a defendant in a discussion of what those rights mean to verify that a defendant understands them, although this may be good practice when the officers know of a defendant's mental condition. *Cf. State v. Dumas*, 145 N.H. 301, 303 (2000). The length of the interview was neither inordinate nor oppressive. *Cf. State v. Spencer*, 149 N.H. 622, 629 (2003); *Hopkins v. Cockrell*, 325 F.3d 579, 584-85 (5th Cir.) (holding confession involuntary because defendant isolated for fifteen days and interviewed nine times during that period), *cert. denied*, 540 U.S. 968 (2003). The interview lasted only fifteen minutes and the defendant confessed immediately.

This case differs from *Wesley B.*, where we held the trial court erred in admitting the inculpatory statement of an eleven-year-old boy with "low average intelligence" who was questioned for over two hours without the presence of legal counsel or a guardian. *Wesley B.*, 145 N.H. at 431. In *Wesley B.*, the juvenile's "will was overborne" rendering his confession involuntary. *Id.* at 432. Unlike in *Wesley B.*, the defendant here did not deny the stabbing in the face of continued police questioning. *Id.* at 432. He confessed immediately and freely. A corrections officer also testified that the defendant asked him, "[H]ow bad did I f . . . that guy up?" after the interview. The detectives here also testified that the defendant appeared "lucid" and spoke "pretty articulate[ly]," whereas the juvenile in *Wesley B.* was " 'slow,' fidgety, and had trouble paying attention." *Id.* at 431. Here, unlike in *Wesley B.*, we cannot say that the superior court's finding was contrary to the manifest weight of the evidence viewed in the light most favorable to the State.

The defendant argues that the detectives used "subtle coercion" that, combined with his mental condition, overbore his will. The defendant points to the fact that he sent two inmate request slips inquiring about the possibility of charges in January 2007 and received only a "[m]inimal" response to one of them. While that response may have been "minimal," it did not, as the defendant argues, "forc[e] the defendant to speak with the officers to get the minimal information he desired." There was "nothing coercive, deceptive or overbearing in the police's conduct." *Hammond*, 144 N.H. at 405 (quotation omitted) (statement voluntary of a defendant suffering from depression, conducted in a cold parking lot by an officer who was a friend, partially because there was "nothing coercive, deceptive, or overbearing in the police's conduct"); *see Chapman*, 135 N.H. at 400-01 (confession voluntary where the police knew the defendant was intoxicated but did not take advantage of the defendant's intoxication). At no point did

the two detectives make any direct or implied promises in order to obtain the statement from the defendant. *Cf. Rezk*, 150 N.H. at 491 (confession involuntary where induced by specific promise of leniency).

In sum, based upon our review of the trial court's determination of voluntariness, construed in the light most favorable to the State, we cannot say that the trial court's finding was contrary to the manifest weight of the evidence. Accordingly, we affirm the trial court's ruling.

*Affirmed.*

DALIANIS, J., concurred; DUGGAN, J., concurred specially; BRODERICK, C.J., dissented.

DUGGAN, J., concurring specially. I concur in the majority opinion with the understanding that the holding is not inconsistent with the United States Supreme Court's decision in *Colorado v. Connelly*, 479 U.S. 157 (1986).

BRODERICK, C.J., dissenting. Because I disagree, based upon the evidence presented, that the State proved beyond a reasonable doubt that the defendant's confession was voluntary, I respectfully dissent.

The New Hampshire Constitution provides in part that "[n]o subject shall be . . . compelled to accuse or furnish evidence against himself." N.H. CONST. pt. I, art. 15. Part I, Article 15 guarantees every citizen due process of the law. *State v. Damiano*, 124 N.H. 742, 746 (1984). Because "a defendant's constitutional guarantees of due process may not be violated without the involvement of a State actor," *State v. Nickerson*, 147 N.H. 12, 14 (2001), some State action is required in order to trigger the protections of Part I, Article 15, *see State v. Carroll*, 138 N.H. 687, 691 (1994).

In determining whether the State's actions violated the defendant's due process rights under Part I, Article 15, we look to the dictates of fundamental fairness. *See State v. Winslow*, 140 N.H. 319, 321 (1995); *State v. Denney*, 130 N.H. 217, 220 (1987). "Due process requires not only that the State act according to the laws of the land, but also that its actions be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Damiano*, 124 N.H. at 746 (quotation omitted). "Such fundamental principles are implicated when the State uses an individual's involuntary statements to obtain a conviction against that individual." *Id.*

> The factors underlying the belief that such statements should not be admitted into evidence are the unreliability of the confession, the lack of rational choice of the accused, and society's conclusion that the State should not take advantage of an individual who is incapable of making a free choice.

No single definition of voluntariness is sufficient to cover the range of situations in which the determination of voluntariness must be made. However, the nucleus of the inquiry is whether the actions of an individual are the product of an essentially free and unconstrained choice. If the statements are the product of a will overborne by police tactics, or of a mind incapable of a conscious choice, then the statements are inadmissible at trial.

*Id.* at 746-47 (citations and quotation omitted).

Our State Constitution provides greater protection in this area than the Federal Constitution. Over thirty years ago, we expressly rejected the "preponderance of the evidence" standard to determine whether a defendant's statements were made voluntarily. *State v. Phinney*, 117 N.H. 145, 147 (1977). The United States Supreme Court has held that the preponderance standard satisfies the federal constitutional requirements, but that the states are free to adopt a stricter standard because "[t]hey may indeed differ as to the appropriate restriction of the values they find at stake." *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

In rejecting the federal standard and holding that our State Constitution requires the State to prove beyond a reasonable doubt that the defendant's statements were made voluntarily, we explained:

As early as 1845, it was suggested [by the New Hampshire Supreme Court] that the reasonable doubt standard be used in determining the voluntariness of confessions . . . .

The danger of admitting involuntary confessions is as great now as it was then and the policy considerations for excluding confessions which are involuntary are as compelling now as they ever were. There is always the danger that a defendant's involuntary confession will be admitted against him. The preponderance test does not provide a sufficient safeguard against that danger. The adoption of the preponderance standard would amount to a determination that it is no more serious for an involuntary confession to be admitted than it is for a voluntary one to be excluded.

*Phinney*, 117 N.H. at 146-47 (citations omitted). We emphasized that:

A confession is a special type of evidence. Its acceptance basically amounts to conviction. Confessions are usually obtained in the psychological atmosphere of police custody and in the greatest secrecy in which the cards can be stacked against the

accused. He has no means of combating the evidence produced by the police save by his own testimony. The stakes are too high and the risk of error too great to permit a determination of admissibility to be decided by a balance of probabilities.

*Id.* at 147.

We have had few occasions to consider the effect of the mental condition of a defendant in a custodial setting on the voluntariness of his confession under our State Constitution. In *State v. Chapman*, we stated that although proof of a defendant's deficient mental condition, standing alone, is not dispositive of an inquiry into the voluntariness of a confession under Part I, Article 15, it is to be considered "highly significant" in determining whether, under the totality of the circumstances, any official conduct was coercive, deceptive or overbearing in its effect. *State v. Chapman*, 135 N.H. 390, 400-01 (1992). Subsequently, in *In re Wesley B.*, 145 N.H. 428 (2000), we considered whether the trial court erred in admitting the inculpatory statement of a developmentally impaired juvenile. Regarding the significance of the juvenile's impairment to the analysis of whether his statement was voluntary, we stated:

If a person suffers from a mental or developmental condition that impairs that person's ability to comprehend his or her choices, that impairment must also be factored into a court's determination of voluntariness. The due process clause of the State Constitution requires us to label, as involuntary, the statements of an individual who, because of a mental condition, cannot make a meaningful choice. However, mental illness does not, as a matter of law, render a confession involuntary. Rather, the trial court still must determine whether, given the totality of the circumstances, the defendant's statements were the product of a rational intellect and a free will.

*Id.* at 430-31 (quotation omitted).

The juvenile, an eleven-year-old of low average intelligence, was interviewed by the police for close to two hours without the presence of his mother, legal counsel, guardian ad litem or psychological evaluator. *See id.* at 432. Although the officer's questioning was not verbally hostile or threatening, it was inconsistent with the procedures later suggested by the psychologist, and adopted by the court, to address the juvenile's language and attention deficits. *See id.* We concluded that "the trial court did not properly weigh all the relevant factors in conducting its review of voluntariness" because it "was required to address not simply whether the minor's will was overborne, but also whether the juvenile's capacity for

self-determination was critically impaired." *Id.* at 431 (quotation and brackets omitted). An examination of the totality of the surrounding circumstances, including the juvenile's age, educational level, educational impairments, and the length of his solitary interview, demonstrated that the juvenile's "will was overborne." *Id.* at 432. Accordingly, we held that the State failed to establish beyond a reasonable doubt that the confession was voluntary. *Id.* at 433.

Pursuant to our case law, therefore, an individual's mental impairment is "highly significant" in determining whether any official conduct was overbearing in its effect, *Chapman*, 135 N.H. at 401, and "that impairment must also be factored into a court's determination of voluntariness," *Wesley B.*, 145 N.H. at 430. Furthermore, whether a police interview was coercive is "measured by the nature of the interview within the context of [the defendant's] abilities." *Id.* at 431. The totality of the circumstances test necessarily involves an inquiry into the effect of mental illness on a particular defendant. Circumstances which may pass constitutional muster when applied to a defendant free of impairment may not be constitutionally tolerable when applied to one who is mentally impaired.

The record before us demonstrates that when the defendant was admitted to the Secure Psychiatric Unit (SPU) of the state prison in August 2006, he suffered from severe depression, suicidal ideation, auditory and visual hallucinations, mood disorders, and an anti-social personality disorder. Testing placed him in the "severe range of hopelessness." His Global Assessment Functioning Scale score indicated impairment in reality testing or communication, or major impairment in several areas such as work, school, family relations, judgment, thinking or mood. His judgment was labeled "poor." At the time of the interview with police on March 19, 2007, during which he confessed to an alleged assault, the defendant was incarcerated in the Secure Housing Unit (SHU). He was receiving numerous medications daily including medications to treat depression, anxiety, and certain psychiatric conditions. The latter medication had been doubled in dosage just three days prior to the interview.

At the hearing on the motion to suppress, Detective Puckett testified that he began investigating the incident on January 5, 2007, the day after the alleged assault, when he went to the SPU where the defendant was "being held in an isolation tank." According to Detective Puckett, the defendant chose not to speak to him, indicating that "he wanted to talk to an attorney but at some point in the future he may want to speak to us."

· Three days later, the defendant sent an inmate request slip asking: "What is the current status of this alleged investigation for assault? I've been in SHU now five days . . . . No one's seen me since SPU, and then I was told outside charges were being pursued. Please let me know what is

going on." The defendant did not receive a reply to this request. On January 12, the defendant sent a second inmate request slip asking: "What is the current status of the incident that brought me to SHU? No one has answered any requests in regards to this matter and I don't know if I should seek outside legal counsel. Please let me know what is going on." At some point a response was made by Sergeant Dinsmoor of the department of corrections investigation bureau. There is no evidence in the record concerning the specifics of the response, although the defendant's brief characterizes it as providing "minimal information."

On March 19, 2007, Detective Puckett and Sergeant Dinsmoor went to the SHU to interview the defendant in the "attorney visit room," after prison staff relayed a request from him that he wanted to speak with the investigating officers. The defendant maintains in his brief that he wanted to speak with them "to find out what was going on."

At the suppression hearing, Detective Puckett testified that on the day of the interview, the defendant "seemed good," although he "didn't really know him very well," having only met him once before. Although he knew that the SPU, where the alleged assault occurred, is a psychiatric treatment unit, Detective Puckett testified that he did not seek any information from the SPU medical staff regarding the defendant's mental illness diagnosis or any medications he was taking at that time.

Sergeant Dinsmoor testified that he had known the defendant for the past fourteen years, when the defendant had been in the general prison population, but not when he was in the SPU. According to Sergeant Dinsmoor, on the day of the interview, the defendant appeared "lucid." Sergeant Dinsmoor testified that he did not know that the defendant was diagnosed with auditory hallucinations or that he was suffering from visual hallucinations and paranoid delusions. He testified that he knew that the SPU is a psychiatric treatment unit. He did not ask the SPU medical staff what the defendant's mental diagnosis was or what medications he was taking and whether they could interfere with his abilities.

The trial court's order denying the motion to suppress states that it "was presented with evidence that the defendant was well able to sufficiently process information and make choices." This evidence included "the interchanges that took place between the defendant and the investigators" and "other evidence such as Inmate Request Slips." In addition, the trial court noted that the defendant was "provided with his *Miranda* warnings and waived his rights," and had had time between the alleged incident and the interview to "reflect on whether he should speak with the investigating officials." Based upon the fact that there "was no overbearing or other impropriety in terms of the conduct of the investigating law enforcement officials," that the defendant "was described as being lucid during the

interview," that one of the officers "had noted that he had known [the] defendant for some fourteen years while [the] defendant was at the State Prison and that the defendant's demeanor has not been out of the ordinary," the trial court concluded that the "defendant's statements to law enforcement concerning this matter were voluntarily and freely made."

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. *State v. Plch*, 149 N.H. 608, 613, *cert. denied*, 540 U.S. 1009 (2003). Our review of the court's legal conclusions, however, is *de novo*. *Id.* When the underlying subject of the suppression motion is the voluntariness of a confession, we will not reverse the trial court's decision unless it is "contrary to the manifest weight of the evidence, as viewed in the light most favorable to the State." *State v. Spencer*, 149 N.H. 622, 627 (2003) (quotation omitted).

We determine voluntariness by looking at the totality of the surrounding circumstances to assess whether the confession was the product of an essentially free and unconstrained choice. *See Wesley B.*, 145 N.H. at 430. If a person suffers from a mental condition which impairs that person's ability to comprehend his or her choices, such impairment must be factored into the court's determination. *Id.* A deficient mental state may be highly significant in determining whether any given police conduct was overbearing in its effect. *Chapman*, 135 N.H. at 400-01. "Both the characteristics of the accused and the details of the interrogation are considered. The court . . . look[s] at the factual circumstances surrounding the confession, the psychological impact on the defendant, and the legal significance of how the defendant reacted, in order to determine whether the police exerted such an influence on the defendant that his will was overborne." *Aubuchont*, 147 N.H. at 146 (quotation omitted).

"Mental illness . . . is a complex psychological condition that is difficult to measure and is always changing in intensity." St. Florian, Note, *Fifth Amendment Miranda Waiver and Fourteenth Amendment Voluntariness Doctrine in Cases of Mentally Retarded and Mentally Ill Criminal Defendants*, 4 SUFFOLK J. TRIAL & APP. ADVOC. 271, 287 (1999). "The courts have recognized that an analysis of the totality of the circumstances must include not only a review of the interrogation techniques used, but also the mental characteristics of the defendant. . . . The focus in cases involving mentally ill . . . defendants should not only be on whether the individual has the ability to understand what is being said to him, but also on his heightened vulnerability to otherwise acceptable police tactics." *Id.* at 288-89.

Despite evidence of mental illness such that the defendant was confined in the SPU, and evidence of the administration of multiple medications, the

State provided no evidence concerning their effect on his ability to make an essentially free and unconstrained choice to confess. The only testimony at the suppression hearing was provided by laypersons who concluded that the defendant "seemed good" and was "lucid." In the absence of credible evidence from a medical professional familiar with the status of the defendant's mental health, the State has failed to establish beyond a reasonable doubt that the defendant's statement was voluntary. *Cf. Wesley B.*, 145 N.H. at 431 (psychologist testified that juvenile's impairments rendered it substantially more difficult for him to decide whether or not to confess); *State v. Dumas*, 145 N.H. 301, 303 (2000) (trial court relied upon State's expert's opinion to find that despite defendant's borderline intelligence, he was capable of understanding the meaning and effect of waiving his rights); *Damiano*, 124 N.H. at 747 (after listening to testimony of the psychiatrist, the defendant, and the police officers, trial court found that State had proved beyond a reasonable doubt that statements were voluntary).

Accordingly, I would hold that in the presence of objective facts which, at the time of the confession, put the State on notice of the defendant's mental condition, the State bears the burden at the suppression hearing to offer medical evidence that the defendant's capacity for self-determination was not thereby impaired. In addition, the fact that the defendant was housed in solitary confinement, that he was provided with little information about the investigation, and the brief nature of the interview at which he confessed raise further concerns whether his will was overborne and his confession voluntarily given.

Detective Puckett testified that when he first went to speak with the defendant concerning the alleged assault, he was being held in an isolation tank. At oral argument before us, it was represented that between January 5, the day after the alleged assault, and March 19, the date of the confession, a span of approximately two-and-a-half months, the defendant was held in solitary confinement for twenty-three hours each day. Yet, there is no evidence in the record concerning the conditions in the SHU and what effect those conditions may have had upon the mental health of this defendant. *See Aubuchont*, 147 N.H. at 146 (court must consider psychological impact on defendant of factual circumstances surrounding the confession); *State v. Decker*, 138 N.H. 432, 436 (1994) (trial court heard testimony about defendant's living conditions of confinement, viewed living quarters at prison and recognized that if court found these conditions to have overborne the defendant's will, his confession would have to be suppressed).

Despite the fact that the defendant initially stated that he wanted to speak with an attorney, there is no evidence in the record that he was

allowed to do so. Although the defendant sent an inmate request slip seeking information about the investigation, it was not answered. A second inquiry about the investigation, specifically asking if he should seek outside legal counsel, apparently was answered with "minimal information." Thus, notwithstanding attempts to obtain basic information about the status of the investigation and whether he should invoke his right to counsel, the defendant's requests were largely ignored.

The defendant's subsequent request to speak with prison officials about the status of the pending investigation resulted in a visit from the police over two months after the alleged incident, at which time during a fifteen-minute interview the defendant waived his rights and confessed to the alleged assault. There is no evidence in the record whether the defendant was aware that the police were coming on March 19 to speak with him. The trial court reasoned that the passage of over two months between the time of the alleged incident and the interview "allowe[d] [the] defendant time to reflect on whether he should speak with the investigating officials." However, it is equally plausible that spending over two months in solitary confinement had the effect of exacerbating his underlying conditions of depression, anxiety and psychiatric disorders, thereby increasing the likelihood that the conduct of the officials was overbearing in its effect.

The State points to the fact that the interview with the defendant only lasted fifteen minutes in support of its position that it was not coercive. However, the brevity of the interview calls into question the true voluntary nature of the confession in this case where a mentally ill, medicated inmate who has spent over two months in solitary confinement is confronted by two police officers, without the presence of counsel and yet, in the span of just fifteen minutes, engages in an allegedly adequate discourse over the waiver of his rights, is sufficiently presented with the charges against him and approves a written confession prepared by the police officers. I further note that we have recognized that "videotaping custodial interrogation may lessen the inherent speculation, avoid unwanted claims of coercion, and generally assist all parties in assessing what transpired during the interrogation." *State v. Farrell*, 145 N.H. 733, 739 (2001).

Considering the facts of the interview in light of all of the surrounding circumstances, as well as the State's failure to submit sufficient evidence addressing whether the defendant's mental health critically impaired his capacity for self-determination, I conclude that the trial court's decision is contrary to the manifest weight of the evidence when viewed in the light most favorable to the State. The evidence does not permit a conclusion that the State has established beyond a reasonable doubt that the defendant's

will was not overborne and that his confession was voluntarily given. Accordingly, I would reverse the trial court's denial of the defendant's motion to suppress his confession.

The State suggests that even if admission of the confession was error, the error was harmless beyond a reasonable doubt because the alternative evidence of the defendant's guilt was overwhelming. I would hold that the State cannot meet its burden in this case. The victim testified that while watching television in the dayroom with other inmates, the defendant jumped on his back and started pounding him. When he returned to his room, he realized he was bleeding from multiple puncture wounds. No blood was found in the dayroom and no blood was found on the defendant. Aside from the victim's testimony, the State relied upon the defendant's confession. Without the confession, I disagree that the alternative evidence of the defendant's guilt was overwhelming beyond a reasonable doubt.

An underlying principle in the enforcement of our criminal law is that our system is accusatorial, not inquisitional. Under an accusatorial system, determinations of guilt are based upon "evidence independently and freely secured." *Rogers v. Richmond*, 365 U.S. 534, 541 (1961). "[A] system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois*, 378 U.S. 478, 488-89 (1964). I would hold that the admission of the confession at trial was not harmless error beyond a reasonable doubt and, accordingly, I would reverse the defendant's conviction.