Hillsborough-northern judicial district
No. 99-750

### THE STATE OF NEW HAMPSHIRE

v.

### JAMES AUBUCHONT

November 2, 2001

*Philip T. McLaughlin*, attorney general (*N. William Delker*, senior assistant attorney general, on the brief and orally), for the State.

*Risa Evans* and *Behzad Mirhashem*, assistant appellate defenders, of Concord (*Ms. Evans* on the brief, and *Mr. Mirhashem* orally), for the defendant.

BROCK, C.J. The defendant, James Aubuchont, appeals his conviction for first degree assault following a jury trial in Superior Court (*Sullivan*, J.). *See* RSA 631:1 (1996). The defendant contends that the trial court erred in admitting his statements to the police because they were involuntary and obtained in violation of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm.

On January 28, 1999, the defendant and his wife, Patricia Aubuchont, brought their ten-week-old son, Tristan, to the Elliot Hospital emergency room complaining that he was not breathing. Tristan was transferred to the Dartmouth-Hitchcock Clinic in Lebanon due to the seriousness of his injuries. Hospital personnel informed the police that this was a likely case of shaken baby syndrome.

The next day, Manchester Police Detectives Peter Favreau and John Patti went to the hospital to speak to the Aubuchonts individually. Patricia Aubuchont was resistant to being questioned and stated that she distrusted the police and wished to speak with a lawyer. The defendant, on the other hand, was cooperative and after speaking to his wife convinced her to speak with the detectives. In a hospital conference room, the detectives first interviewed Patricia Aubuchont, who described Tristan's deteriorating health during the preceding days. She also gave the detectives the names of three people, including Tina Maselli, who had been alone with Tristan. Patricia then ended the interview, stating that the detectives could call her attorney if they had more questions.

The detectives next questioned the defendant. He also described Tristan's symptoms on the days prior to his hospitalization and his own attempts to stimulate the baby's breathing on the way to the hospital. After approximately fifteen to thirty minutes, the defendant's interview ended abruptly when Patricia entered the conference room and announced

that she was leaving the hospital. In response to this interruption, the defendant said to the police, "I have to go with my wife; um, I—I'm sorry, I have nothing more to say at this time. If that changes, I'll let you know."

Shortly thereafter, as the Aubuchonts were preparing to leave the hospital, the detectives asked them if they would answer additional questions in order to complete the interrupted interview. The defendant repeated that he had nothing further to say and would contact them if anything changed. The Aubuchonts agreed, however, to discuss the possible outcomes of the case. Detective Favreau then explained that they were the main suspects and he hoped they would be honest and that one of them would take responsibility, otherwise they could both end up suffering. The detective voiced concerns for the child's safety and noted the defendant's potential parole violation based upon being named a suspect. The defendant ended the discussion and reiterated that he had nothing further to say and would contact the detectives if that were to change.

That evening, the detectives went to the Aubuchonts' residence to obtain contact information for the three people Patricia had identified as having had access to Tristan alone. Upon their arrival, Patricia yelled from within the house for the police to leave and to consult with the Aubuchonts' attorney if they had more questions. After Favreau asked who their attorney was, the defendant gave the detectives the attorney's name and telephone number and they departed.

On January 30, the next day, Detective Patti contacted the defendant's parole officer, David White, to inform him of the investigation. As a consequence, Officer White went to the defendant's home to arrest him for a 72-hour hold on a parole violation, based upon his failure to report his contact with the police. As the arresting officers were taking him away in handcuffs, the defendant instructed his wife to contact an attorney. Officer White then brought the defendant to the police station for processing.

That same day, Detectives Favreau and Patti interviewed Tina Maselli at the police station. Maselli told contrary stories, first stating that she had seen the defendant shake Tristan, then claiming that she shook the baby herself. She then waived her *Miranda* rights and gave a written statement that she had shaken Tristan. After writing the statement, however, she recanted her confession. Unsure of which story was true, Detective Favreau went to the defendant's holding cell with Maselli's statement.

Upon arriving at the defendant's cell, Detective Favreau informed him that he had new information on the case and would show it to the defendant on the condition that he not react to it prior to waiving his *Miranda* rights. After the defendant read Maselli's written statement, he agreed to waive his *Miranda* rights. The defendant told Favreau that he

was cold and uncomfortable and wanted to leave the cell. The defendant was not wearing shoes or a jacket. Favreau agreed to conduct the interview outside of the cell. Before leaving the cell, Favreau read each line of the *Miranda* waiver with the defendant, who initialed each line and executed the form.

Favreau brought the defendant to an interview room where he reminded him that he could stop talking at any time and that he was under arrest, but not for the particular incident involving Tristan. The defendant stated that he was thinking about calling his wife before answering any questions. After taking several minutes to decide whether to call his wife, the defendant stated that he was comfortable making an independent decision to speak with the police. Before the questioning began, however, the defendant changed his mind and called his wife to inform her that he was talking to the police and had waived his *Miranda* rights.

At the outset of the interview, the defendant told Detective Favreau that Maselli falsely implicated herself to protect him because of her romantic interest in him. Favreau then said that Maselli had seen the defendant shake the baby. The defendant started to cry and said, "What the f---? I'm screwed now." After relating to Favreau that he wanted to be honest but did not wish to go back to jail, the defendant decided to give a written statement. Favreau left the defendant alone to write his statement. When Favreau returned, he told the defendant that he would like to question him and offered to tape record the session. The defendant agreed to be questioned and opted to have the interview taped, explaining his mistrust of the police. He proceeded to give an account of the events leading up to Tristan's hospital admittance where he administered compressions and hit the child on the back to induce breathing. The defendant stated that he wanted to bring Tristan to the hospital earlier, but was afraid of going back to jail. Following the interview, the defendant was arrested for first degree assault.

Prior to trial, the defendant moved to suppress the statements he made on January 30 to Detective Favreau at the police station, alleging that he involuntarily made them under coercive conditions and that the police obtained them in violation of his right to counsel. After an evidentiary hearing, the court denied the motion to suppress.

On appeal, the defendant argues that his written and oral statements were involuntary because he succumbed to the stress of coercive police tactics. He also maintains that the police failed to honor his request for an attorney, thus violating his right to counsel.

*I. Voluntariness of Statements*

The defendant first argues that his statements were the result of police coercion, which included: (1) numerous attempts by the police to question him; (2) threats that the defendant or his wife would be harmed by his failure to tell the truth; (3) being shown, prior to his *Miranda* waiver, Tina Maselli's recanted statement; and (4) placement in a cold cell causing him to agree to interrogation in order to escape the extreme conditions. The defendant raises this argument under both Part I, Article 15 of our State Constitution and the Fifth Amendment of the United States Constitution. We address the State constitutional argument first, citing to federal law only as an aid to our analysis. *State v. Ball*, 124 N.H. 226, 231 (1983). We need not conduct a separate federal constitutional analysis because our State Constitution affords the defendant greater protection than does the Federal Constitution in this area. *State v. Gotsch*, 143 N.H. 88, 90 (1998), *cert. denied*, 525 U.S. 1164 (1999).

Our State Constitution requires the State to prove beyond a reasonable doubt that the defendant's statements were made voluntarily. *State v. Hammond*, 144 N.H. 401, 404 (1999). Whether a confession is voluntary "is initially a question of fact for the trial court, whose decision will not be overturned unless it is contrary to the manifest weight of the evidence, as viewed in the light most favorable to the State." *Id.* at 404-05 (quotation omitted).

> To be considered voluntary, a confession must be the product of an essentially free and unconstrained choice and not extracted by threats, violence, direct or implied promises of any sort, or by the exertion of any improper influence. In determining the voluntariness of the confession, the trial court must examine the totality of the surrounding circumstances. Both the characteristics of the accused and the details of the interrogation are considered. The court should look at the factual circumstances surrounding the confession, the psychological impact on the defendant, and the legal significance of how the defendant reacted, in order to determine whether the police exerted such an influence on the defendant that his will was overborne.

*State v. Monroe*, 142 N.H. 857, 864 (1998), *cert. denied*, 525 U.S. 1073 (1999) (quotations and brackets omitted).

■ First, the defendant argues that the detectives' attempts to interview him, despite his repeating that he would contact them, indicated "that they would persist until they obtained a confession," consequently inducing him into making unwanted statements. The two detectives' initial contact with the defendant was at a twenty-minute hospital interview on January 29. Their next contact was shortly thereafter, in the hospital, when they asked the defendant to answer additional questions because Patricia's interruption had prevented them from completing the interview. When the defendant expressed his unwillingness to continue the interview, the detectives left. We do not agree with the defendant that this was part of a police tactic to wear down his free will; rather, the detectives were merely trying to finish the interrupted interview.

The defendant argues that the detectives attempted to interrogate him a third time that evening at his home. The detectives' purpose for this visit, however, was to obtain contact information on the three people Patricia had identified as having been alone with Tristan. The police never entered the defendant's home and left promptly when Patricia asked them to leave.

The defendant contends that these contacts with the police, cumulatively, caused him to make incriminating statements the next day at the police station. We disagree. The police conducted two formal interviews and briefly contacted the defendant on two occasions. In *State v. Laurie,* even where the police conducted three actual interviews over five days, we did not find that the police had exercised coercive tactics to induce a confession. *State v. Laurie,* 135 N.H. 438, 440, 445-46 (1992), *cert. denied,* 506 U.S. 886 (1992). Similarly, here, the detectives did not exert undue coercion when they interviewed and contacted the defendant the day before his questioning at the police station.

■ Next, as further evidence of police coercion, the defendant points to: (1) Detective Favreau's threat that if the defendant or his wife "did not confess, both would suffer"; and (2) his use of Maselli's recanted written statement, where she incriminated herself in the crime against Tristan. Describing the charges that a suspect may face or the implications of his actions "is not inherently coercive and does not render a confession involuntary." *State v. Chapman,* 135 N.H. 390, 399-400 (1992); *see also State v. Carroll,* 138 N.H. 687, 693 (1994). In fact, it is "quite proper . . . to succinctly describe the situation the defendant face[s]." *State v. Portigue,* 125 N.H. 352, 365 (1984) (finding officer's threat of future prosecution did not overbear defendant's free will). By stating that the defendant or his wife would suffer if he were not truthful, the police were merely explaining that if the defendant failed to tell the truth, innocent parties could be unjustly charged with the crime against Tristan. Likewise, when Detective

Favreau showed the defendant Maselli's statement, he was presenting the potential implication of innocent parties. This discussion was not coercive by nature and did not render his confession involuntary.

■ The defendant contends that another factor which unduly induced him into giving a statement was the cold temperature of the cell in which he was held for four hours before his questioning at the police station. He argues that the "extreme physical discomfort" he endured in the cell was equivalent to a threat of physical violence, which renders a confession involuntary. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). The defendant states that there was "a realistic possibility" that he only agreed to be interrogated in order to leave the cell. This argument is unfounded. While the defendant requested that the interrogation be conducted outside of his cell because he was cold, the fact that the cell was cold and uncomfortable did not rise to the level of imposing a "threat of physical violence." In *State v. Decker*, where the conditions were far more severe, we did not find that the circumstances of the defendant's incarceration overcame his free will. *State v. Decker*, 138 N.H. 432, 436-37 (1994). Likewise, here, the defendant was not induced to make incriminating statements solely in order to be removed from a cold cell for one and one-half hours. Our conclusion is further supported by the fact that the record does not indicate that the defendant asked to be made more comfortable before Favreau approached him for questioning.

■ Lastly, the defendant's outward characteristics support the finding that his statements were voluntary. Prior to and during interrogation, the defendant was "capable of rational and intelligent thought ... evaluating what was in his best interests and weighing his options." *Laurie*, 135 N.H. at 446. He was calm, thoughtful and cooperative before and during questioning, even commenting that he previously had not wanted to incriminate himself. The defendant was allowed to call his wife to inform her that he had waived his *Miranda* rights. He was also given ample time alone to write out a statement. Furthermore, the defendant requested that the questioning be taped because he did not trust the police. After considering the totality of the circumstances, we conclude that the trial court's decision that the confession was voluntary is not contrary to the manifest weight of the evidence.

## II. Right to Counsel

The defendant argues that during his arrest on January 30, he invoked his right to counsel when he asked his wife to call an attorney during his arrest. Thus, the defendant contends that the police violated Part I, Article

15 of the State Constitution and the Fifth and Fourteenth Amendments to the Federal Constitution when they interrogated him without having made counsel available. In deciding this case, we first look to our State Constitution and as guidance refer to the Federal Constitution. *State v. Ball*, 124 N.H. 226, 232 (1983). We make no separate federal constitutional analysis because our State Constitution affords the defendant greater protection than does the Federal Constitution in this area. *See State v. LaFountain*, 138 N.H. 225, 227 (1994). It is well established that when a person is taken into custody, he or she must be advised of the right to an attorney before interrogation is initiated. *Miranda*, 384 U.S. at 444. It is uncontested that the defendant was in custody both during his arrest and during his interrogation at the police station.

█ To invoke the right to counsel, a defendant must "adequately indicate" that the purpose of a request for an attorney is to have counsel present during interrogation. State v. Grant-Chase, 140 N.H. 264, 267-68 (1995), cert. denied, 517 U.S. 1140 (1996). Therefore, when a request for counsel is made "[p]re-interrogation, there is no irrebuttable presumption that the ... request ... was for the purpose of having counsel present during the imminent interrogation." Id. at 267. In other jurisdictions, courts have rejected anticipatory invocations of *Miranda*, holding that a person in custody must be subject to interrogation or be under the threat of imminent interrogation in order to invoke the right to counsel. People v. Villalobos, 737 N.E.2d 639, 646 (Ill. 2000); see also United States v. Grimes, 142 F.3d 1342, 1348-49 (11th Cir. 1998), cert. denied, 525 U.S. 1088 (1999).

In the instant case, when the defendant asked his wife to contact an attorney, he had no expectation that imminent interrogation would commence. Similarly, in Grant-Chase, while in custody and prior to any questioning, the defendant asked to call her attorney. Grant-Chase, 140 N.H. at 266. Subsequent to her call, the police requested an interview and the defendant agreed and waived her *Miranda* rights. Id. Despite the defendant's indication that she sought assistance of counsel, we held that it was unclear if she desired counsel to assist her during some future interrogation because she made the request before knowing of any forthcoming interrogation. Id. at 267-68. Likewise, here, the timing of the defendant's request controls whether he invoked his *Miranda* rights. The purpose of the defendant's request was ambiguous, because he made his request before he was subject to interrogation or under the threat of imminent interrogation. Therefore, it is unclear whether the defendant simply wished to seek advice from his attorney or whether he wished to

obtain assistance of counsel for some future interrogation. We conclude that the defendant did not invoke his right to assistance of counsel.

*Affirmed.*

BRODERICK, NADEAU and DALIANIS, JJ., concurred.