Hillsborough-northern judicial district
No. 2001-679

## THE STATE OF NEW HAMPSHIRE

v.

## JESSICA FLEETWOOD

Argued: January 15, 2003
Opinion Issued: April 28, 2003

*Stephen J. Judge,* acting attorney general (*Simon R. Brown* and *Michael A. Delaney,* senior assistant attorneys general, on the brief, and *Mr. Brown* orally), for the State.

*David M. Rothstein,* deputy chief appellate defender, of Concord, by brief and orally, for the defendant.

DUGGAN, J. The defendant, Jessica Fleetwood, was convicted by a jury of second-degree murder in the death of her two-month-old son. *See* RSA 630:1-b, I (1996). Before trial, she moved to suppress her statements to the police. The Trial Court (*Barry,* J.) suppressed statements obtained before the defendant was advised of her *Miranda* rights, but admitted statements she made after waiving those rights. *See Miranda v. Arizona,* 384 U.S. 436 (1966). The defendant also filed a motion *in limine* to exclude expert testimony by the chief medical examiner regarding the cause of death. The trial court denied this motion.

On appeal, the defendant argues that the trial court erroneously: (1) admitted her post-*Miranda* statements; and (2) denied her motion to exclude the chief medical examiner's testimony. We affirm.

*I. The Facts*

The following facts were adduced at the suppression hearing. On the morning of January 3, 2000, the defendant found her two-month-old son dead in his bassinet. The defendant called her mother, who then called 911. When rescue personnel arrived, the infant appeared to have been dead for some time.

Shortly thereafter, Manchester Police Detective John Patti arrived at the defendant's apartment to conduct a Sudden Infant Death Syndrome (SIDS) investigation. Patti spoke with the defendant and her mother. Patti, however, did not have a SIDS checklist with him or paper for taking notes. Patti saw a spiral notebook on the kitchen table and, with permission, used it to take notes.

Patti began interviewing the defendant regarding the events of the preceding twenty-four hours. She told him that she had fed the baby formula at 4:00 a.m. and put him to bed before she went to bed. She said that in the last week the baby had had black streaking in his vomit and

stool. She then said, "I can't believe this happened again" and stated, "I guess I just wasn't meant to be a mom." She explained that two years ago she had given birth to a stillborn child.

As he spoke with the defendant and her mother, Patti noticed that they seemed anxious to go to the hospital to which the baby had been transported. Because Patti needed to continue his SIDS investigation by obtaining the baby's bedding, formula and other items, he asked the defendant's mother, who rented the apartment, to sign a consent to search form. After he read the form to her, she signed it.

Patti telephoned the station and asked for someone to bring him evidence bags and a camera to photograph the scene. Patti spoke with Detective Peter Favreau who had experience with SIDS investigations. Favreau arrived at the apartment and helped Patti gather evidence. Patti took photographs while Favreau kept a photo log using the same notebook. While the detectives were in the apartment, another officer called and told them to locate the baby's pacifier with blood on it. The detectives found two pacifiers but did not see blood on either one.

When the detectives completed their work, Patti tore three pages out of the notebook, which contained his notes and the photo log. On the next page, Patti saw a handwritten note saying, "Kill the Boy." That page also contained several drawings including a broken heart with the phrase "help me" written inside it, a reference to Charles Manson and the phrase "the dog told me to kill." Patti said to Favreau, "You are not going to believe what I just found." Patti took the notebook with him.

The detectives went to Elliot Hospital and talked with the assistant medical examiner, who had conducted a preliminary examination of the body. The examiner told him that he did not observe anything unusual about the body but would need to conduct an autopsy. The medical examiner estimated the time of death to be 4:00 a.m.

Detective Patti noticed that there was dried mucus and blood around the baby's nostrils. Patti recalled that the fitted sheet from the baby's bassinet had a blood stain consistent with the baby's nose. Patti then called the police station and requested that an officer be posted to secure the apartment.

When the detectives returned to the police station at approximately 5:25 p.m., the defendant and her mother were already there. They had received a message through a friend that the police wanted to talk to them.

One of the detectives first interviewed the defendant's mother. He showed her the page from the defendant's notebook that said, "Kill the Boy." The defendant's mother said, "it didn't necessarily mean it was about the baby. It could have been about old boyfriends or whatever."

Before interviewing the defendant, Patti and Favreau agreed that they would question her regarding the notebook only after they had completed the SIDS checklist. Patti testified that he was aware that the defendant was twenty years old and had an eighth grade education.

The detectives met the defendant in the police station lobby and took her to the interview room on the second floor. The interview room contained one table and three chairs but no window. The defendant sat in the chair closest to the unlocked door with both detectives on either side of her.

The first interview began at approximately 5:30 p.m. and lasted for two and a half hours. For the first forty-five minutes of the interview, Favreau reviewed the SIDS checklist with the defendant. The detectives then asked her to recount the events of the last twenty-four hours.

The defendant said that between 10:00 p.m. and midnight she had put her son in his bassinet to sleep. She then went to sleep and did not hear from him again until 4:00 a.m. when she fed him some formula, which he spit up. At 5:00 a.m., he woke up coughing. She put a pacifier in his mouth and went to sleep until 10:00 a.m. At approximately 10:30 a.m., she discovered him dead.

When the defendant failed to tell the detectives whether she knew how the baby died, Patti put her notebook on the table. The defendant explained each of the writings, but skipped over "Kill the Boy." When Favreau drew her attention to the phrase, the defendant stated, "I've had thoughts of killing him before." This statement surprised Favreau so he asked the defendant to explain these thoughts.

The defendant explained that she had financial and weight problems, and that she felt that she was a burden on her mother. She said that the baby's natural father had asked her on occasion to get rid of him. She explained that, in the past, these thoughts had led to thoughts of killing the baby. She said that she had told her fiancé that she had thoughts of killing her baby but that she had not acted on her thoughts.

Favreau asked the defendant again about the 4:00 a.m. feeding. He told the defendant that, based on the time of death, what she had told the detectives did not make sense. He pleaded with her to be honest with him. The defendant maintained her version of events but, after additional questioning, she stated that the baby had a "tendency to push his face into her chest and armpit area." When asked when was the last time he did that, the defendant said that the baby had done this right after the 4 a.m. feeding.

Favreau asked "if it was possible that while he was pushing his face into her chest if perhaps she had squeezed his chest too tight at that point?" The defendant responded, "You are coming up with things I have never

thought of before." Favreau said that, as he questioned whether she squeezed her baby too much, the defendant was conversational, not angry or upset.

Favreau then "asked her at one point if it was possible she had actually held [the baby's] face down in the bassinet." The defendant responded, "No." She said that she had not shaken, dropped or squeezed him. Favreau then said, "you are telling me things you haven't done. Is there anything that you did or what did you do?" The defendant responded that after the 4:00 a.m. feeding, she picked up her son from the bassinet and held him against her chest. The defendant demonstrated how she held him with his face against her chest. She explained that "as she was holding him against her at one point she realized he was struggling to breathe or he couldn't breathe." At this point in the narrative, the defendant said, "I am going to jail now."

Favreau testified that although the defendant showed a lack of emotion throughout the interview, "she showed some emotion as she began to describe the fact that her son was struggling to breathe and she held him against her in the sense that she welled up with tears at that point. But as far as her conversational tone or her tone of voice was concerned it hadn't change[d] at all."

The defendant said that she woke up at 10:00 a.m. and looked at the bassinet, hoping that everything was fine. She did not take a close look but left the bedroom to use the bathroom and smoke a cigarette. She stated that she did not return to the room because "to get close and look at him would only make it more real." Eventually, she called her mother to tell her something was wrong. She said that "in her mind she knew she had done it, she knew something was wrong and she was hoping it was a dream." Soon thereafter, a 911 operator called her and told her to attend to the baby. The defendant said that it was then that she found the baby dead and that she was not surprised because of what had happened.

At 8:00 p.m., the detectives decided to take a break and advise the defendant of her *Miranda* rights. They told the defendant that they were not going to speak with her further until they went over a form with her. The detectives testified that they had not advised the defendant of her *Miranda* rights earlier because "she hadn't said anything that would make her responsible criminally or otherwise for her son's death."

Before leaving the interview room to obtain a *Miranda* form, the detectives asked the defendant if she wanted a break to use the bathroom, or to eat or drink. The defendant responded, "No." At approximately 8:17 p.m., the detectives returned to the interview room and read the *Miranda* form to the defendant. She placed a check mark beside each *Miranda* right, indicating that she understood them. She also wrote her initials next

to "yes" in response to the questions "Do you understand each of these rights?" and "Are you willing to talk to us and answer questions?" The defendant told the detectives she would provide both a written and a taped statement.

The detectives left the defendant alone in the room to write her statement on the completed *Miranda* form. The defendant wrote her statement in approximately ten minutes, finishing at approximately 8:50 p.m. In it, she stated that she had been thinking about her problems and had "seized the opportunity (while my son was in my arms) and took out my frustrations by smothering him into my chest. I lay him down in his bassinet, moved his head to the side and went to bed."

When she finished her statement, the detectives offered her a break, use of the bathroom, and a chance to have food and drink. Patti gave the defendant cigarettes and a bottle of water, but she did not leave the interview room.

The detectives then began the first taped interview by reading the defendant her *Miranda* rights again. She indicated that she would talk to the detectives and did not want a lawyer and signed another written waiver. During the thirty-five minute interview, the defendant made additional incriminating statements.

After the interview ended at approximately 9:30 p.m., the detectives offered the defendant cigarettes, food, water and a chance to use the bathroom. She declined their offers. The detectives took a break and left her alone in the room.

The second taped interview began at approximately 11:00 p.m. Because Favreau was asked to participate in interviewing the defendant's fiancé, Patti conducted the second taped interview alone. He reviewed the defendant's *Miranda* rights again on tape and in writing. The defendant never asked for an attorney or to see her mother. The defendant made further incriminating statements during this taped interview, which ended at 11:25 p.m.

After another approximately fifteen minute break, Favreau joined Patti for the final taped interview. The detectives again advised the defendant of her *Miranda* rights. She again made inculpatory statements after indicating that she would talk to the detectives. Patti testified that, throughout the interviews, he never raised his voice or accused the defendant of lying. Following this third taped statement, which ended at approximately 11:52 p.m., the defendant was arrested.

Before trial, the defendant moved to suppress all of her incriminating statements to the detectives. The defendant argued that none of these statements were voluntary, including her post-*Miranda* statements. The court's original order found that the defendant was in custody when the

detectives confronted her with the "Kill the Boy" note and, at that point, was entitled to *Miranda* warnings. Because no warnings were given, the court suppressed all statements she made after she was confronted with her notebook, including statements after her waiver.

The State moved for reconsideration, arguing that the post-*Miranda* statements were admissible. The court agreed and found that the State met its burden of proving beyond a reasonable doubt that the defendant's post-*Miranda* statements were voluntary.

## II. Admissibility of Defendant's Statements

On appeal, the defendant argues that the trial court erred in concluding that her post-*Miranda* statements were voluntary without considering additional factors. She contends that the trial court should have considered the following factors: there was no time lapse between the unwarned confession and the subsequent warnings and confessions; she did not have contact with a relative or friend between the confessions; the interrogations occurred at the same location; and the police did not tell her that her unwarned statement could not be used against her. The State argues that the court properly applied the totality of the circumstances test set forth in *State v. Aubuchont*, 141 N.H. 206 (1996) (*Aubuchont I*), and that "the absence of a change in physical location and the relatively short time period between the unwarned and warned statements ... are less significant factors in cases where the initial unwarned statements were made voluntarily and absent coercion."

■■ We address these arguments relying upon the New Hampshire Constitution, which "provides greater protection to a criminal defendant with respect to confessions than does the Federal Constitution." *Id.* at 208 (quotation and ellipses omitted). We only reference federal cases to aid in our analysis. *Id.*; *see State v. Ball*, 124 N.H. 226, 232 (1983). "Our State Constitution requires the State to prove beyond a reasonable doubt that the defendant's statements were made voluntarily. Whether a confession is voluntary is initially a question of fact for the trial court, whose decision will not be overturned unless it is contrary to the manifest weight of the evidence, as viewed in the light most favorable to the State." *State v. Aubuchont*, 147 N.H. 142, 146 (2001) (citation and quotation omitted). *But cf. Lego v. Twomey*, 404 U.S. 477 (1972) (under Federal Constitution, voluntariness of confession may be proven by preponderance of evidence). "To be voluntary, a confession must be the product of an essentially free and unconstrained choice and not be extracted by threats, violence, direct or implied promises of any sort, or by the exertion of any improper

influence" or coercion. *State v. Monroe*, 142 N.H. 857, 864-65 (1998), *cert. denied*, 525 U.S. 1973 (1999).

Until *Miranda,* the admissibility of all confessions was governed solely by the voluntariness test. *Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961). When there was more than one confession, a finding that the first confession was involuntary could render all subsequent confessions inadmissible because "after an accused has once let the cat out of the bag by confessing, . . . he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag." *United States v. Bayer*, 331 U.S. 532, 540 (1947). However, the accused was not permanently disabled from giving a confession that would be admissible once the circumstances that would preclude its use were removed. *Id.* at 541.

When the first confession is voluntary but violates *Miranda*, the analysis is different, as we explained in *Aubuchont I*, 141 N.H. at 208-09. In *Aubuchont I*, the police first questioned the defendant at the hospital shortly after he had brought in his infant son for treatment. *Id.* at 207. The defendant was not advised of his rights and made an incriminating statement. *Id.* The police instructed the defendant to report to the police station the following afternoon for more questioning. *Id.* When he arrived at the station the next day, the police informed him that he would be arrested and advised him of his *Miranda* rights. *Id.* The defendant executed a written waiver and made a second confession. *Id.*

The trial court suppressed the defendant's first confession as a violation of *Miranda* but admitted the second confession. *Id.* On appeal, the defendant conceded that the first confession was voluntary but argued that the second confession should be suppressed as the "fruit" of the inadmissible first confession. *Id.* We rejected the defendant's argument that our State Constitution creates a rebuttable presumption that the subsequent confession was tainted by an initial *Miranda* violation. *Id.* at 209. Instead, we held that we would "apply our traditional part I, article 15 due process voluntariness inquiry and ask whether, considering the totality of the circumstances, the second confession is the product of an essentially free and unconstrained choice." *Id.* (citations and quotations omitted).

We concluded that the trial court's determination that the second confession was voluntary was not against the manifest weight of the evidence. *Id.* We relied upon the fact that the second confession was made seventeen hours after the *Miranda* violation, that during that period the defendant was not in custody, and that the "[t]he trial court . . . found that once the defendant arrived at the station, the evidence is virtually uncontradicted that he was advised of his *Miranda* rights, understood

them, and waived them.". *Id.* (quotation omitted). We noted that even though the police "did not inform the defendant that the first confession would not be used against him and in fact scheduled the interview to go over a statement that the defendant had given at the hospital, this alone does not give rise to the conclusion that the second confession was involuntary." *Id.* (citation, quotation, brackets and ellipses omitted).

In *Aubuchont I*, we relied upon *Oregon v. Elstad,* 470 U.S. 298, 301-02 (1985), where the defendant's unwarned confession occurred in his living room and the post-*Miranda* confession occurred an hour later at the police station. The Oregon Court of Appeals had concluded that given the brief period separating the two confessions, the "cat was sufficiently out of the bag to exert a coercive impact on respondent's later admissions," *id.* at 303 (quotation and brackets omitted), and held that "only lapse of time and change of place could dissipate . . . the 'coercive impact' of the inadmissible statement." *Id.* at 309-10.

The United States Supreme Court reversed, holding that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary." *Id.* at 318. The court refused to adopt a rigid rule "requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary." *Id.* Instead, the court held that where the pre-*Miranda* confession is not coerced, the fact finder "must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.*

Here, unlike *Elstad* and *Aubuchont I,* there was one continuous interrogation by the same detectives at one location interrupted only by a fifteen-minute break to comply with *Miranda. See Elstad,* 470 U.S. at 301; *Aubuchont I,* 141 N.H. at 206-07. While the facts were similar in *State v. Dellorfano,* 128 N.H. 628, 630-31, 636-37 (1986), we did not there consider the significance of the absence of a time lapse between the unwarned and the post-*Miranda* confession.

The facts of this case bring into sharp focus the concern that *Elstad* may "give a green light to law enforcement officers to ignore the requirements of *Miranda* until *after* such time as they are able to secure a confession." *United States v. Carter,* 884 F.2d 368, 373 (8th Cir. 1989). This concern has persuaded at least one court to reject *Elstad* and hold that when there is a "close sequence" between the unwarned statement and its repetition after *Miranda* warnings, the second statement is inadmissible. *People v. Bethea,* 493 N.E.2d 937, 939 (N.Y. 1986).

The State argues that we should adopt the approach of *United States v. Esquilin,* 208 F.3d 315 (1st Cir. 2000), and affirm the trial court's order. In

*Esquilin,* after the local police arrested the defendant, an agent from the Maine Drug Enforcement Agency arrived and took control of the investigation. *Id.* at 317. Even though the local police told the agent that the defendant had not been advised of his rights, the agent immediately began interrogating the defendant. *Id.* After eliciting several incriminating statements, the agent read the defendant his *Miranda* rights. *Id.* The defendant waived his rights and made another confession. *Id.*

The court stated that *Elstad* was not limited to circumstances where there is a time lapse between two confessions. *Id.* at 319. The court said that under *Elstad,* "the lapse of time between interrogations is relevant only when the statement obtained in violation of *Miranda* was actually coerced." *Id.* The court then noted that "although the elapsed time between interrogations is one factor that may dissipate the taint of a coerced confession, the lesser taint of a *Miranda* violation may be dissipated by subsequent warnings even if the unwarned and warned statements are obtained during the same interrogation." *Id.*

By contrast, in *Carter,* 884 F.2d at 369, postal inspectors interrogated the defendant for nearly an hour before obtaining incriminating statements. The inspectors then advised Carter of his rights, obtained a waiver and Carter wrote out a confession. The court assumed without deciding that the first confession was voluntary but ruled that the second confession was inadmissible. *Id.* at 373. The court found significant that the first and second confessions "occurred as part and parcel of a continuous process .... [T]he second confession came almost directly on the heels of the first." *Id.* The court said, "We think *Elstad* did not go so far as to fashion a rule permitting this sort of end run around *Miranda." Id.*

If, as *Esquilin* suggests, compliance with *Miranda* in the midst of a continuous interrogation serves, without considering other circumstances, to render the post-*Miranda* confession admissible, then *Elstad* would amount to an end run around *Miranda.* For that reason we believe, as we stated in *Aubuchont I,* the proper analysis is a totality of the circumstances test. *Aubuchont I,* 141 N.H. at 209.

In *Aubuchont I,* it was "virtually uncontradicted" that the defendant had executed a knowing and voluntary waiver of his *Miranda* rights before the second confession. *Id.* (quotation omitted). We, nonetheless, did not base our conclusion that the defendant's post-*Miranda* confession was admissible solely upon the waiver. *Id.* at 209-10. Rather, we considered all the circumstances that preceded the second confession in deciding that it was admissible. *Id.* Thus, when determining whether the lesser taint of a *Miranda* violation is dissipated, a broader inquiry is required.

This inquiry into the facts and circumstances surrounding the second confession necessarily encompasses an evaluation of several factors: the time lapse between the initial confession and the subsequent statements; [the defendant]'s contacts, if any, with friends or family members during that period of time; the degree of police influence exerted over [the defendant]; whether [the defendant] was advised that [her] prior admission could not be used against [her]; or whether ... [the defendant] was told that [her] previous statement could be used against [her]. No one factor in isolation will be determinative.

*United States v. Wauneka*, 770 F.2d 1434, 1440-41 (9th Cir. 1985) (citation omitted); *see Carter*, 884 F.2d at 373-74.

Here, the defendant argues that the superior court did not consider all these factors in deciding the admissibility of her post-*Miranda* confessions. In addition, the defendant's brief specifically challenges the validity of her *Miranda* waiver, arguing that, "If the suspect has just confessed, in violation of *Miranda*, her ability to invoke those rights when [they are] read a short while later is ... compromised." In the superior court, however, the defendant did not make a separate claim that her *Miranda* waiver was tainted by the lengthy interrogation that preceded it. In fact, at the hearing on the motion for reconsideration, the State said that the validity of the *Miranda* waiver had not been challenged by the defense. The defense did not dispute this assertion. Consequently, we will not separately address the validity of the defendant's waiver of her *Miranda* rights.

The impact of the other factors on the voluntariness of the confession was, however, raised in the superior court. Nevertheless, the trial judge's order did not specifically address the absence of a time lapse or the fact that the defendant was not told that her unwarned statement could not be used against her. Instead, in his written order, the trial judge found beyond a reasonable doubt that the post-*Miranda* statements were voluntary based upon the "cordial tone of the interview," the defendant's calm tone of voice, the absence of threats, violence or coercion of any kind and the absence of promises or undue influence.

We do not share the defendant's concern that the trial court did not consider the police officers'. failure to advise the defendant that her first unwarned statement would not be admissible against her. While we mentioned this as a factor in *Aubuchont I*, it is impractical to require the police to determine the admissibility of an unwarned confession. This would require them to make legal determinations regarding whether there had been interrogation and custody. *See Dellorfano*, 128 N.H. at 634

(officer called out defendant's nickname in the jail cell area in order to prompt an incriminating answer); *Elstad,* 470 U.S. at 316 (defendant was in custody in his living room). These issues are difficult for officers to analyze objectively in the midst of an interrogation. *Elstad,* 470 U.S. at 316.

■ The trial court's failure to address specifically in its order the absence of a time lapse is more significant. While a time lapse between the unwarned and warned confessions is not required for the subsequent confession to be voluntary, its absence is important and sometimes critical evidence in the totality of the circumstances test. *Compare Elstad,* 470 U.S. at 310, 317-18 (refusing to establish a rigid rule requiring a time lapse), *with Wauneka,* 770 F.2d at 1440-41 (time lapse a factor in totality of the circumstances test). Without a significant break between the unwarned statement and the *Miranda* warnings, an accused may not have the opportunity to be free from the pressure of continuous interrogation and to reflect on the seriousness of her situation. In addition, the absence of a time lapse, coupled with other factors, may create a reasonable doubt as to the voluntariness of the confession. *See Wauneka,* 770 F.2d at 1440-41. Finally, if a defendant has been arrested and is unquestionably in custody and entitled to *Miranda* warnings, *State v. Dedrick,* 132 N.H. 218, 224 (1989), *cert. denied,* 494 U.S. 1007, 1008 (1990), a police decision to delay giving the required warnings and elicit a statement followed immediately by the warnings and another incriminating statement, *see Elstad,* 470 U.S. at 318, strongly suggests that the police are exploiting the inherent pressures of custodial interrogation such that the post-*Miranda* statement should ordinarily be inadmissible. *Carter,* 884 F.2d at 373.

■ None of these circumstances is present in this case. The police gave the defendant the opportunity to take a break after her unwarned admission and before the *Miranda* warnings, but she refused the offer. There was no finding that the other factors were present, such as denial of contact with friends or family. And, importantly, during the interview that preceded the *Miranda* warnings, the defendant's custody status was unclear. She had not been arrested. At the suppression hearing, she testified that she felt free to leave up to the point when the police advised her of her rights.

Finally, while the trial court did not specifically address the absence of a lapse in time in its written order, the trial judge asked the prosecutor several questions during the hearing on the motion for reconsideration about the factual differences between this case and *Aubuchont I.* During this exchange, the trial judge agreed with the prosecutor that the time lapse is not a "controlling factor." As noted above, the trial judge correctly

understood the law. Even though the order did not explicitly say so, it is evident that the court took into account all the relevant factors regarding voluntariness. We therefore cannot say that the superior court's ruling on voluntariness was against the manifest weight of the evidence.

### III. Testimony of Chief Medical Examiner

Before trial, the defendant moved to exclude the chief medical examiner's conclusion that the baby had died from asphyxia due to smothering. The defendant argued that this conclusion was based largely upon the examiner's opinion that her confession was true and that determining the truth of her confession was beyond the examiner's expertise. The State argued that the examiner properly relied upon the defendant's statements, along with objective medical findings from the autopsy, to certify the cause of death. The trial court denied the defendant's motion.

On appeal, the defendant focuses upon the examiner's testimony that his conclusion as to the cause of death "was made largely on the basis of a totally negative autopsy in conjunction with a compelling confession . . . of having smothered the infant provided by Ms. Fleetwood verbally and in writing." The examiner went on to testify that "the over-arching and most compelling factor was the fact that the infant's care-giver offered up a history of having smothered him."

"The decision to admit expert testimony rests within the sound discretion of the trial court. We will reverse this decision only if the appealing party can demonstrate that the ruling was untenable or unreasonable and that the error prejudiced the party's case." *State v. DeCosta*, 146 N.H. 405, 407 (2001) (quotation omitted).

Under New Hampshire Rule of Evidence 702, expert opinion testimony is admissible if such testimony "will assist the trier of fact to understand the evidence [and if] a witness [is] qualified as an expert . . . ." N.H. R. EV. 702.

In addition, New Hampshire Rule of Evidence 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In this case, the examiner was required to conduct an investigation because this was a "medicolegal case." RSA 611:3, II(q) (2001). The examiner testified that various treatises state that the investigation into

the cause of death includes a case history. As at least one court has noted, "[D]etermining the manner of death involves correlating the circumstances that surround the death with the findings at the autopsy and any eyewitness accounts." *Wilson v. State*, 764 A.2d 284, 295 (Md. Ct. Spec. App. 2000), *rev'd on other grounds*, 803 A.2d 1034 (Md. 2002); *see* 40 AM. JUR. TRIALS p. 581 (1990).

The defendant acknowledges that doctors frequently rely upon statements by a patient or others to make a diagnosis. She claims, however, that the examiner gave an expert opinion of her credibility that is inadmissible because its prejudicial value outweighs its probative value, *State v. Huard*, 138 N.H. 256, 259 (1994), and it supplants the jury's responsibility to determine her credibility, *State v. Kulas*, 145 N.H. 246, 247 (2000).

While we agree that the examiner's characterization of the defendant's confession as "compelling" could have been understood by the jury to suggest his opinion as to her truthfulness, nothing prevented the examiner from testifying that he relied upon her confession in determining the cause of death. N.H. R. Ev. 703. Implicit in his reliance upon the confession was his acceptance that it was reliable. *Id.* Thus, even if this characterization was erroneous, the error was significantly limited by otherwise admissible evidence. *State v. Enderson*, 148 N.H. 252, 255 (2002). When viewed against the overwhelming evidence against the defendant, *i.e.*, her confessions to the police, her incriminating writings in her notebook and her admissions to her fiancé that she had thoughts of killing her son in the past, we conclude that any error was harmless.

*Affirmed.*

BRODERICK, NADEAU and DALIANIS, JJ., concurred.