Rockingham
No. 2004-129

### THE STATE OF NEW HAMPSHIRE

v.

### LUCIO E. FERNANDEZ

Argued: February 16, 2005
Opinion Issued: May 23, 2005

*Kelly A. Ayotte*, attorney general (*Robert S. Carey*, assistant attorney general, on the brief and orally), for the State.

*Law Office of Paul J. Haley*, of Hillsborough (*Paul J. Haley* on the brief and orally), for the defendant.

NADEAU, J. The defendant, Lucio E. Fernandez, appeals his conviction by a jury for second-degree murder. *See* RSA 630:1-b (1996). We affirm.

The jury could have found the following facts. The defendant stabbed another man to death. After the stabbing, the defendant threw away the knife and fled the scene. He later fled the East Coast. United States Marshals arrested him approximately seventeen months later in Los Angeles.

At trial, the defendant admitted that he stabbed the victim, but claimed to have acted in self-defense. The defendant testified that the victim initiated the fight, that he and the victim struggled, and that the victim came at him with a knife. Four eyewitnesses testified, however, that the victim was unarmed and that the defendant was the aggressor. Although the defendant testified that the victim injured him, no one who witnessed the incident saw any of the alleged injuries. Numerous witnesses, including the defendant, testified that the victim was quite drunk the night of the murder and that he staggered and appeared unsteady on his feet. His blood alcohol level at death was .33. The defendant was sober.

On appeal, the defendant argues that the Superior Court (*Abramson*, J.) erroneously: (1) denied his request for depositions; (2) denied his request that the court *voir dire* prospective jurors about his race and the fact that he lives in Lawrence, Massachusetts; (3) declined to *voir dire* a juror whom the State alleged was asleep during the State's closing; (4) denied his motion *in limine* to preclude the State from using the words "victim" and "murder" when eliciting testimony at trial; (5) permitted the State to introduce evidence that the defendant remained a fugitive after seeing himself on a television program about the murder; (6) permitted the State to introduce testimony that, before he fled, the defendant had a duffel bag that contained a police scanner and a gun; and (7) denied his motion *in limine* to preclude the medical examiner from testifying that the victim's wounds suggested torture. We address each argument in turn.

*I. Depositions*

Before trial, the defendant requested permission to depose the four eyewitnesses to the murder. *See* RSA 517:13 (1997) (amended 2003). He argued that the depositions were necessary to permit him to discover the extent of the witnesses' criminal records, explore inconsistencies in their prior statements, and unearth further discoverable information. The trial court denied his request, finding that he failed to show by a preponderance of the evidence that deposing the witnesses was necessary. Specifically, the court found that the case was not complex and the State had already provided the defendant with "extensive open file discovery." The court also found that the defendant had other means of ascertaining the witnesses' criminal records such as by interviewing the witnesses.

We evaluate the trial court's decision under our unsustainable exercise of discretion standard. *See State v. Hilton*, 144 N.H. 470, 473 (1999); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001). To prevail, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Hilton*, 144 N.H. at 473.

██ A defendant does not have an unqualified due process right to compel depositions in a criminal case. *Id.* Under RSA 517:13, II, the trial court may permit the defendant to depose a witness if the requested deposition is "necessary" to "preserve the testimony of any witness who is unlikely to be available for trial" or to "ensure a fair trial, avoid surprise or for other good cause shown." To determine whether a deposition is necessary, the court must "consider the complexity of the issues involved, other opportunities or information available to discover the information sought by the deposition, and any other special or exceptional circumstances which may exist." RSA 517:13, II(b).

On appeal, the defendant argues that the court erred because it did not find exceptional circumstances to justify his request for depositions. To the contrary, "[t]he record demonstrates that the trial court weighed the statutory factors and properly ruled that the defendant had not met his burden of establishing necessity." *Hilton*, 144 N.H. at 473.

██ Like the defendant in *Hilton*, the defendant here had "ample information to prepare his defense." *Id.* For each of the four witnesses, the State provided lengthy transcripts of interviews. For two of the witnesses, the State also provided transcripts from and copies of audiotaped interviews. In addition, the State provided police reports about witness statements and transcripts of testimony before the grand jury. Like the defendant in *Hilton*, the defendant here knew in advance of trial of the inconsistencies in the witnesses' statements. *Id.* at 474.

The State also provided the defendant with all requested record checks. Moreover, the court ordered the State to provide the defendant with criminal record checks on all names and aliases the defendant provided and to make individual requests to States that are not part of the criminal record database. Under these circumstances, we hold that the trial court's decision to deny the defendant's request for depositions was a sustainable exercise of discretion.

*II. Jury Voir Dire Before Trial*

Before trial, the defendant, who is of Cuban descent, requested that the court ask prospective jurors about whether his ethnicity or the fact that he lives in Lawrence, Massachusetts, affected their ability to be impartial in this case. The court declined to do so.

The defendant first argues that he has a due process right under the Federal Constitution to have the trial court *voir dire* the jury about racial bias. *See* U.S. CONST. amend. XIV. "[T]he manner in which *voir dire* is conducted is wholly within the sound discretion of the trial judge." *State v. Bone*, 131 N.H. 408, 412 (1989) (quotation omitted). We will not disturb the trial court's decision with respect to *voir dire* unless it is manifestly against the law and the evidence. *Id.* at 410-11.

"The [United States] Supreme Court has determined that under certain limited circumstances special voir dire questioning is constitutionally mandated." *United States v. Brown*, 938 F.2d 1482, 1485 (1st Cir.), *cert. denied*, 502 U.S. 992 (1991). In *Ham v. South Carolina*, 409 U.S. 524, 526-27 (1973), for instance, the Court ruled that the Federal Due Process Clause required the court to ask questions concerning race where the defendant was black and had been active in the civil rights movement in South Carolina. In that case, the defendant's defense was that law enforcement had framed him because of his civil rights activities. *Id.* at 525. "Racial issues therefore were inextricably bound up with the conduct of the trial." *Ristaino v. Ross*, 424 U.S. 589, 597 (1976).

In *Ristaino*, the Court clarified that the Federal Constitution did not require a state court judge to question prospective jurors in *every* case where the races of the defendant and victim differed. *Id.* Rather, for such questioning to be constitutionally required, there must be "special factors" such as those involved in *Ham*. *Id.* As a plurality of the Court explained in *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981): "There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." Nor is there a *"per se* constitutional rule in such circumstances requiring inquiry as to racial prejudice." *Rosales-Lopez*, 451 U.S. at 190. The Court will find a trial court's denial of

a defendant's request to examine jurors about racial prejudice unconstitutional "[o]nly when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case." *Id.*

"The broad inquiry in each case [is] whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be indifferent as they stand unsworne." *Turner v. Murray*, 476 U.S. 28, 33 (1986) (quotation, ellipsis and brackets omitted). Thus, in *Turner*, the court held that "a capital defendant accused of an interracial crime" has a constitutional right "to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Id.* at 36-37.

The defendant has failed to show that there were "special factors" of the sort at issue in *Ham*. Based upon the circumstances in this case, we cannot conclude that racial issues were "inextricably bound up with the conduct of the trial." *Ristaino*, 424 U.S. at 597.

The defendant suggests that, in the exercise of our supervisory authority, we should mandate that trial courts ask prospective jurors questions about racial bias where, as here, the perpetrator and the victim are of different ethnicities and the crime at issue is a violent one. *See Rosales-Lopez*, 451 U.S. at 192. While we agree with the United States Supreme Court that "the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant," *Ristaino*, 424 U.S. at 597 n.9, we decline to exercise our supervisory authority to adopt such a mandatory rule at this time.

The defendant also impliedly invites us to overrule *Bone*, 131 N.H. at 411, and its progeny, in which we held that there is no presumption of racial prejudice and that trial courts need not always ask specific *voir dire* questions about possible racial prejudice. He asserts that "the tenor of the times" dictates that we reconsider these decisions because the public, he contends, "has been inundated by the television, radio and news media[] with drug case after drug case involving Latinos from Lawrence, Massachusetts." The defendant's speculation about alleged prejudice against Latinos from Lawrence, Massachusetts is insufficient to compel us to revisit our prior decisions. *See Jacobs v. Director, N.H. Div. of Motor Vehicles*, 149 N.H. 502, 504-05 (2003). Moreover, the rulings about which he complains are consistent with decisions by the United States Supreme Court. *See Rosales-Lopez*, 451 U.S. at 190. Accordingly, we decline his invitation.

■ The defendant next contends that the trial court erred when it did not permit his attorney to ask *voir dire* questions. He asserts that because

New Hampshire "is not a heavily populated state" and "the jury pool in Rockingham County is relatively small and homogeneous[,] . . . [a]ttorney conducted voir dire is necessary so that counsel for the parties may gain necessary information about the juror's [*sic*] biases and prejudices so as to meaningfully exercise their preemptory [*sic*] challenges." We find the defendant's conclusory argument unpersuasive. As the defendant aptly notes in his brief, the practice in New Hampshire has been that jury *voir dire* is conducted solely by the trial judge, except in capital and first-degree murder cases. *See State v. McLellan*, 146 N.H. 108, 111 (2001). *But cf.* RSA 500-A:12-a (Supp. 2004). As this was a second-degree murder case, we find no error in the trial court's denial of the defendant's request that his attorney question prospective jurors.

*III. Jury Voir Dire During Trial*

After closing arguments, the prosecutor informed the court that one of the jurors had been asleep during the closings. One of the defendant's attorneys also observed the juror sleeping, although he stated that she was not "dead asleep." A bailiff told the judge that court observers had pointed at the juror because they noticed that she seemed to be "nodding off." Another bailiff was told by a reporter that the reporter saw the juror sleeping.

Based upon the above, the court found that the juror was not paying attention and that she appeared to have been sleeping. The court denied defense counsel's request that the juror be *voir dired* about whether she was sleeping. The court then designated the juror as an alternate. *See* RSA 500-A:13 (1997).

On appeal, the defendant argues that the court's decision was arbitrary and an unsustainable exercise of discretion. To show an unsustainable exercise of discretion, the defendant must demonstrate that the trial court's decision was clearly unreasonable and that the decision prejudiced his case. *Lambert*, 147 N.H. at 296.

The defendant asserts that because there was an articulable factual basis to conclude that the juror was incompetent, the court was required to *voir dire* the juror about whether she was sleeping. *Cf. State v. Colbath*, 132 N.H. 708, 710 (1990). He cites no direct authority for this proposition. Nor does he make any showing of prejudice. We conclude therefore that the court's decision not to *voir dire* the sleeping juror was sustainable.

We decline to address the defendant's argument that the trial court's decision compromised his right to a fair and impartial trial because he has not developed it sufficiently to warrant appellate review. In the realm of appellate review, a mere laundry list of complaints, without developed

legal argument, is insufficient to warrant judicial review. *State v. Blackmer*, 149 N.H. 47, 49 (2003). The defendant's off-hand invocation of constitutional rights, supported by neither argument nor authority, warrants no extended consideration on appeal. *Id.*

*IV. Use of Words "Victim" and "Murder"*

Before trial, the defendant moved *in limine* to prevent the State and its witnesses, during questioning, from using the word "victim" to describe the man the defendant killed and the word "murder" to describe the defendant's alleged act. The trial court denied the motion as to the use of the word "murder," but required the State to use the phrase "alleged victim" to describe the man the defendant killed. The defendant did not seek to preclude the State from using the words "victim" and "murder" in its opening and closing arguments.

On appeal, the defendant impliedly argues that permitting the State and its witnesses to use the word "murder" was error because the word was substantially more prejudicial than probative given his claim of self-defense. *See* N.H. R. Ev. 403. He does not cite any cases to support this proposition.

We accord the trial court considerable deference in determining whether probative value is substantially outweighed by the danger of unfair prejudice, and we will not disturb its decision absent an unsustainable exercise of discretion. *State v. Jordan*, 148 N.H. 115, 117 (2002).

"Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *Id.* (quotation omitted). It is not, however, evidence that is merely detrimental to the defendant because it tends to prove his guilt. *See id.* "The prejudice required to prove reversible error is an undue tendency to induce a decision against the defendant on some improper basis, such as evidence of issues that are emotionally charged." *State v. Stott*, 149 N.H. 170, 172 (2003).

Even if use of the word "murder" may have prejudiced the defendant, the trial court could reasonably have determined that the prejudice was slight and did not substantially outweigh any probative value. Where the defendant is charged with second-degree "murder," the use of the word "murder" would not necessarily raise a negative implication in the mind of a reasonable juror.

Even without the word, the jury could have concluded that the defendant "murdered" the victim based upon the evidence. This evidence was that the defendant stabbed the victim in the stomach, cutting his pancreas, slashed his face deep enough to cut the facial muscles, and kicked him after his eyes rolled back in his head and he fell to the ground. It also included the testimony of four eyewitnesses who, contrary to the defendant's testimony, said that the victim was unarmed and too intoxicated to defend himself.

██ Under these circumstances, we hold that it was within the trial court's discretion to permit the State and its witnesses to use the word "murder" to describe the defendant's act.

*V. Evidence of Consciousness of Guilt*

*A. Appearance on America's Most Wanted Television Program*

Before trial, the State moved *in limine* to admit evidence that the defendant had appeared on the television program, *America's Most Wanted.* The State argued that evidence of the defendant's appearance, and his acknowledgement that, although he knew that the episode aired, he remained a fugitive, was relevant to show his consciousness of guilt and disprove his claim of self-defense.

Over the defendant's objection, the trial court granted the motion in part and denied it in part, instructing the State that it could refer to the program as a television show or program, but that it could not refer to the program by name. The court found "the title of the program, itself, is more prejudicial than probative of defendant's consciousness of guilt." The court further ruled that the State could admit this evidence only through the defendant's cross-examination.

At trial, during the State's cross-examination, the following colloquy occurred:

Q. And you saw yourself on a TV show?

A. Yes.

Q. Still stayed on-the-run even after seeing yourself on a TV show?

A. Yes.

Q. That TV show was about what you had done?

A. Yes.

Q. The police wanted to talk to you?

A. Yes.

Q. And you stayed on-the-run?

A. Yes.

On appeal, the defendant argues that this evidence was irrelevant and, even if relevant, that it was insufficiently probative of flight and consciousness of guilt to outweigh the danger of unfair prejudice. *See* N.H. R. Ev. 401, 403.

"Evidentiary rulings are within the sound discretion of the trial court, and the defendant has the burden to demonstrate that the trial court's discretionary ruling is clearly untenable or unreasonable to the prejudice of his case." *State v. Steed*, 140 N.H. 153, 155 (1995) (quotations and citations omitted).

■ Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. "It is beyond dispute that evidence of post-offense flight is probative ... of the defendant's consciousness of guilt." *State v. Torrence*, 134 N.H. 24, 27 (1991). In this case, evidence that the defendant saw himself on a television program and remained a fugitive was relevant to show his consciousness of guilt.

■ "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." N.H. R. Ev. 403. Although the evidence may have prejudiced the defendant, we uphold the trial court's determination that its probative value was not "substantially outweighed by the danger of unfair prejudice." *Id.* "Intent was a hotly contested issue at trial." *Steed*, 140 N.H. at 156. Accordingly, the trial court justifiably assigned the evidence a high probative value. *Id.* Moreover, that the trial court precluded the State from referring to the television program by name minimized the danger of unfair prejudice. At trial, the jury heard only that the defendant saw himself on a "TV show" that "was about what [he] had done" and "stayed-on-the run even after seeing [himself] on [the] ... show."

## B. Admission of Duffle Bag and Its Contents

Before trial, the defendant moved *in limine* to exclude "any testimony that a duffle bag inside a motor vehicle in which [the defendant] was a passenger on the night of the incident, or any duffle bag allegedly belonging to [the defendant], contained guns or any other weapons." After the State submitted an offer of proof, the trial court granted the

defendant's motion in part and denied it in part. The court permitted the State to introduce evidence related to the defendant's possession of a duffle bag containing guns immediately before his period of flight. The court precluded the State, however, from introducing evidence that the duffle bag in the vehicle with the defendant on the night of the murder contained any weapons.

At trial, the State elicited testimony that the day after the murder, one of the defendant's friends met the defendant at his sister's house in Lawrence, Massachusetts. The friend then drove the defendant to Lowell, Massachusetts, to get something to eat. Before the defendant and his friends left his sister's home, the defendant was given a duffle bag that contained a police scanner and a gun. The defendant told his friend that his brother was going to pick him up and that he was going to "get out of here that week." The defendant also said that "he wasn't going in alive, that he was not going back to jail. He would rather be dead and he would kill himself first before he went to prison." The friend then drove the defendant back to his sister's house. The defendant later fled the State.

■ The defendant argues that admitting this evidence was error. We disagree. Like the evidence that the defendant remained a fugitive after seeing himself on television, evidence that, before fleeing the State, he had a duffle bag with him that contained guns and a police scanner, was probative of his consciousness of guilt. *See id.* at 155-56. The probative value of this evidence was not "substantially outweighed by the danger of unfair prejudice." N.H. R. Ev. 403; *see Steed,* 140 N.H. at 156.

*VI. Medical Examiner's Testimony*

The defendant moved *in limine* to preclude the State's expert from testifying that the victim's injuries were consistent with "taunting" or "torture." The trial court denied this motion, ruling that the State could elicit this opinion from its expert, provided the State laid a proper foundation.

At trial, the expert, a medical examiner for the Office of the Chief Medical Examiner in Boston, Massachusetts, who performed the autopsy on the victim, testified as follows:

> Q. Now, based on your experience and on the nature of forensic medicine, how pattern plays a significant role in evaluating trauma marks, do you have an opinion as to the manner in which these three incisions in [the victim]'s left upper arm were caused?

A. In my opinion, these injuries resemble a cluster of injuries caused when a person is being threatened by another person; an assailant makes tentative jabs and then musters enough courage or musters that drive to commit one final act, one or two final acts. So, it would be threatening or torture injuries.

Q. Now, Doctor, assuming that you weren't in the parking lot that night, how can you say they—how can you describe the injuries that way?

A. Again, it goes by putting the multiple injuries together. You're looking at the body in complete—in total, looking at the facial injuries, the other injuries, and these injuries as a group indicates that this sub-group or this big cluster of injuries was formed by torture, was as a result of torture.

The defendant argues that admission of this testimony was error because it "interpreted the intent of the defendant at the time of the incident and went way beyond medical evidence and [the expert's] area of expertise." He further contends that permitting the expert to use the word "torture" to describe the victim's injuries prejudiced him because it "connotes the embodiment of evil itself and suggests depravity on the part of the perpetrator."

The decision to admit expert testimony rests within the sound discretion of the trial court. *State v. Fleetwood*, 149 N.H. 396, 408 (2003). We will reverse this decision only if the appealing party can demonstrate that the ruling was untenable or unreasonable and that the error prejudiced the party's case. *Id.*

██ ██ Expert opinion testimony is admissible if such testimony "will assist the trier of fact to understand the evidence" and if the witness is qualified as an expert. N.H. R. Ev. 702. Under New Hampshire Rule of Evidence 703:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

"Objections to the basis of an expert's opinion go to the weight to be accorded the opinion evidence, and not to its admissibility. The appropriate method of testing the basis of an expert's opinion is by cross-examination

of the expert." *State v. Newman*, 148 N.H. 287, 292 (2002) (quotation omitted).

 The defendant does not dispute the expert's qualifications. Instead, he argues that by testifying that the injuries to the victim's arm were caused by "torture," the expert opined about the defendant's state of mind and that this opinion is inadmissible because it is more prejudicial than probative. While we agree that the word "torture," in isolation, has a disturbing connotation, nothing prevented the expert from using the word to describe his perceptions of the victim's injuries. In context, we do not agree with the defendant that the examiner's use of the word "torture" was an opinion about the defendant's state of mind. It was a description of the victim's wounds and their cause, not the defendant's intent.

Even if the expert's testimony was inadmissible, in light of the overwhelming evidence against the defendant, we hold that any error was harmless. *See Fleetwood*, 149 N.H. at 409. This evidence included the defendant's admission that he stabbed the victim, the testimony of four eyewitnesses who disputed the defendant's claim that he acted in self-defense, and the defendant's admission that he remained a fugitive for seventeen months after killing the victim.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.